UNITED STATES of America, Plaintiff,

v.

NEW ENGLAND GROCERS SUPPLY CO. et al., Defendants.

Crim. A. No. 76–368–C.

United States District Court, D. Massachusetts.

March 5, 1980.

As Amended April 30, 1980.

Walter B. Prince, Asst. U. S. Atty., Boston, Mass., for plaintiff.

Robert Y. Murray, Ramsey, Serino & Murray, Patricia G. Curtain, Moulton & Looney, Albert F. Cullen, Jr., Cullen & Wall, Boston, Mass., for defendants.

## OPINION

CAFFREY, Chief Judge.

This is an appeal from defendants' convictions for violating § 301(k) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 331(k). On July 6, 1976 the government filed a seven count information charging New England Grocer Supply Co. (NEGSC) and five individual defendants with causing certain foodstuffs to become adulterated, within the meaning of 21 U.S.C. §§ 342(a)(3) and (4),[1] while being held for sale after shipment in interstate commerce, in violation of 21 U.S.C. § 331(k).[2] The defendants waived their right to trial by jury before a district court judge and con-

---

1. Section 402 of the Act, 21 U.S.C. § 342, provides in relevant part:

"A food shall be deemed to be adulterated—
"(a) . . . (3) if it consists in whole or in part of any filthy, putrid, or decomposed substance, or if it is otherwise unfit for food; or (4) if it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health . . . . . ."

2. Section 301 of the Act, 21 U.S.C. § 331, provides in relevant part:

"The following acts and the causing thereof are prohibited:

\* \* \* \* \* \*

"(k) The alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, or the doing of any other act with respect to, a food, drug, device, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded."

sented to be tried before a United States magistrate, pursuant to 18 U.S.C. § 3401. After a trial before the magistrate, NEGSC and three of the individual defendants, Julian J. Leavitt, president of NEGSC, Joel A. Leavitt, vice-president of NEGSC, and Julian Schultz, vice-president of NEGSC and general manager of the facility where the foodstuffs became adulterated, were found guilty on all counts of the information.[3] The corporation was fined $1,000 on each count, Julian Leavitt was fined $250 on each count, and Joel Leavitt and Julian Schultz were both fined $500 on each count.

The scope of review by a district court on appeal from a conviction before a magistrate is "the same as on an appeal from a judgment of a district court to a court of appeals." 18 U.S.C. § 3402; Rule 8(d), *Rules of Procedure for the Trial of Minor Offenses Before United States Magistrates.* The defendants challenge the conviction below on several grounds.

I

■ The first ground of appeal relates solely to the defendant Julian Leavitt, president of NEGSC. He contends that he was found guilty by the magistrate solely because he was company president at the time the violations occurred. This was error, defendant argues, because the Supreme Court's decision in *United States v. Park,* 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975), requires a finding of negligence or other blameworthiness in order to sustain a conviction for violation of the Food, Drug, and Cosmetic Act.

In *Park,* the Supreme Court reconsidered and reaffirmed the standard of liability set forth in *United States v. Dotterweich,* 320 U.S.´277, 64 S.Ct. 134, 88 L.Ed. 48 (1943), for conviction of a corporate officer under the Act. *Dotterweich* established two propositions. First, the Act "dispenses with the conventional requirement for criminal conduct—awareness of some wrongdoing." *Id.*

at 281, 64 S.Ct. at 136. Second, the scope of liability includes all those who have "a responsible share in the furtherance of the transaction which the statute outlaws . . . ." *Id.* at 284, 64 S.Ct. at 138. In *Park,* the Court reaffirmed the first proposition and elaborated somewhat on how the government establishes a "responsible relationship" under *Dotterweich.*

The *Park* Court stated that *Dotterweich* and the cases following it establish that "the Act imposes [on responsible corporate agents] not only a positive duty to seek out and remedy violations when they occur but· also, and primarily, a duty to implement measures that will insure that violations will not occur." 421 U.S. at 672, 95 S.Ct. at 1911. The government establishes a prima facie case against corporate officer "when it introduces evidence sufficient to warrant a finding by the trier of the facts that the defendant had, by reasons of his position in the corporation, responsibility and authority either to prevent in the first instance, or promptly to correct, the violation complained of, and that he failed to do so." *Id.* at 673–74, 95 S.Ct. at 1912. The Court made it clear however, that a finding of guilty cannot be predicated solely on the defendant's corporate position. *Id.* at 674–75, 95 S.Ct. at 1912–13.

The defendant in *Park* was the president and chief executive officer of a national retail food chain. He was charged with the same crime as is the defendant in the instant case, *viz.,* causing foodstuffs being held for sale following shipment in interstate commerce to become adulterated in violation of 21 U.S.C. § 331(k). Park contended as does the defendant here, that jury instructions allowed the jury to convict him solely on the basis of his corporate position. The Supreme Court did not agree. Viewing the charge in its entirety, the Court was convinced that "the charge did not permit the jury to find guilt solely on the basis of respondent's position in the

---

3. Two other individual defendants, Ronald B. Cain, warehouse manager, and James J. Kaminski, warehouse sanitation officer, were originally charged in the information. The charges against Cain were dismissed by the government before trial and Kaminski was acquitted by the magistrate.

corporation; rather it fairly advised the jury that to find guilt it must find respondent 'had a responsible relation to the situation,' and 'by virtue of his position . . . had . . . authority and responsibility' to deal with the situation." *Id.* at 674, 95 S.Ct. at 1912. The Court was also satisfied from its reading of the trial record that "the jury could not have failed to be aware that the main issue for determination was not respondent's position in the corporate hierarchy, but rather his accountability, because of the responsibility and authority of his position, for the conditions which gave rise to the charges against him." *Id.* at 675, 95 S.Ct. at 1913.

The defendant in the instant case contends that the magistrate found him guilty solely because of his corporate position as chief executive officer and that this was error since *Park* requires a finding of negligence or other blameworthiness. Although the defendant makes only one argument with two conjunctive parts, he asserts two separate and distinct grounds for reversal and I will treat them as such. The first ground is that the magistrate erred by convicting him solely on the basis of his corporate position; the second ground is that the magistrate erred by not making a finding of negligence or other blameworthiness.

Reviewing the magistrate's memorandum and findings, I conclude that the magistrate misconstrued the *Park* decision with regard to defendant Julian Leavitt. Although it appears that the magistrate understood and correctly applied *Park's* requirement of a "responsible relationship" in finding two other individual defendants guilty, several statements in his opinion convince me that he did not do so in convicting Julian Leavitt. Early in his opinion, the magistrate made the following observation about the *Park* decision: "Park (President of the corporation 'Acme') was individually convicted for violation of the Act by *virtue of his position as president.*" (Opinion at 3) (emphasis added). Later on, the magistrate again noted that *Park* "stands for the proposition that *the head of a corporation can be charged because of his position as a corporate chief.*" (Opinion at 7) (emphasis add-

ed). These two statements demonstrate a basic misinterpretation of *Park,* since the Supreme Court made it clear that a corporate officer cannot be convicted solely on the basis of his position in the corporate hierarchy. This misunderstanding of *Park* is reflected in the magistrate's finding that defendant Julian Leavitt was guilty of violating the Act. In his "general discussion" section, the magistrate stated explicitly that the "finding made by this court with respect to Julian was made *only on the basis that in Park, the court stated that the position of the President made him liable, responsible and subject to prosecution.*" (Opinion at 10) (emphasis added). This comment clearly indicates that the magistrate applied the wrong legal standard in convicting Julian Leavitt, finding him guilty solely by reason of his position as president.

To be sure, as the government points out, there are some contrary indications. In his findings of fact, the magistrate found that, beyond a reasonable doubt, "Julian who was President, although active in the operation of the company, had no direct involvement in sanitation problems, except as senior officer with ultimate authority and responsibility for preventing any violations of the Act." (Opinion at 8). This finding could be interpreted as indicating that the magistrate based the defendant's conviction on his "responsible relationship" to the violation rather than on his position as president; this interpretation is, however, negated by the explanation which the magistrate gave for his finding in his "general discussion" section. The government also points to statements made by the magistrate in a section entitled "conclusions." The government appears to rely primarily on the following "conclusion" by the magistrate:

"That Julian, by virtue of office, as one in complete control is guilty within the meaning of the Act as interpreted by *Park, supra,* in that he possessed the final authority to institute whatever effective programs that were required." (Opinion at 9).

234

Although the last part of this "conclusion" does comment on the defendant's "authority" to prevent violations of the Act, the "conclusion" as a whole is tainted by the same misinterpretation of the *Park* decision. And, even if the "conclusion" could be read as a finding on the defendant's responsible relationship with the violations, it would not support a conviction because the magistrate did not make the finding "beyond a reasonable doubt." The government also points to other "conclusions" by the magistrate: that Julian Leavitt "had been consulted with respect to the condition at the warehouse and [was] in direct contact with" defendant Julian Schultz who was general manager and "in complete control"; that Julian Leavitt and other individual defendants could have prevented the violations had they used "higher standards of foresight and vigilance"; and that the defendant Julian Leavitt acknowledged that the "sanitation program was inadequate" at the time of the inspections. Whatever effect these "conclusions" would have in establishing a responsible relationship on the part of Julian Leavitt had the magistrate employed the proper legal standard, I choose not to credit them because of the magistrate's misinterpretation of *Park*.

Admittedly, looking for guidance in the *Park* decision is a difficult experience. The line drawn by the Court between a conviction based on corporate position alone and one based on a "responsible relationship" to the violation is a fine one, and arguably no wider than a corporate bylaw. Nevertheless, the Court clearly stated that a conviction under the Act could not be based on corporate position alone and required a finding as to the defendant's responsibility and authority to correct violations of the Act. The magistrate made such a finding with regard to the other individual defendants, but not as to Julian Leavitt. Therefore, his conviction must be reversed.

As noted earlier, defendant's contention that he was convicted solely on the basis of his corporate position was made conjunctively with the contention that the magistrate erred by convicting him without making a finding of negligence or other blameworthiness. Because this second half of the argument speaks to the same issue raised by the second ground of appeal, I will not consider it separately here.

Thus, the conviction of defendant Julian Leavitt is reversed and his case is remanded to the magistrate for an express finding as to whether the government sustained its burden of proving beyond a reasonable doubt that the defendant bore a responsible relationship to the Food, Drug, and Cosmetic Act violations alleged in the information. If the magistrate determines that defendant did not bear a responsible relationship to the violation, he should enter a judgment of acquittal. If, however, the magistrate finds that the evidence did establish a responsible relationship, he may reinstate the defendant's conviction, but only if reinstatement is warranted after the magistrate makes the findings required by this Court's ruling on defendants' second ground of appeal. In either event, the magistrate is to state the evidentiary basis for his ruling on the responsible relationship issue.

II

The defendants' second ground of appeal is that the convictions of Julian Leavitt, Joel Leavitt, and Julian Schultz must be reversed because the magistrate did not find, *beyond a reasonable doubt*, that these defendants were not powerless to prevent or correct the violations of the Act. Instead, the defendants argue, the magistrate used a less rigorous, and therefore infirm standard of guilt. To support this contention, the defendants point to the magistrate's comment in his "general discussion" section that the "court is further satisfied that it was not 'objectively impossible' to maintain the warehouse in a sanitary condition." (Opinion at 10). This finding is invalid, the defendants posit, because the magistrate did not mention that he was satisfied "beyond a reasonable doubt", a finding they contend is required by *Park*. It is important to note that the defendants do not challenge the sufficiency of the evidence to make such a finding, just that the magistrate employed an improper legal standard.

The defendants' contentions relate to what is generally referred to as the "impossibility" defense. That defense derives from the following statement by the Court in *Park*:

"The duty imposed by Congress on responsible corporate agents is, we emphasize, one that requires the highest standard of foresight and vigilance, but the *Act, in its criminal aspect, does not require that which is objectively impossible.* The theory upon which responsible corporate agents are held criminally accountable for 'causing' violations of the Act *permits a claim that a defendant was 'powerless' to prevent or correct the violation* to 'be raised defensively at a trial on the merits.' *United States v. Wiesenfeld Warehouse Co.,* 376 U.S. 86, 91 [84 S.Ct. 559, 563, 11 L.Ed.2d 536] (1964). If such a claim is made, the defendant has the burden of coming forward with evidence, but this does not alter the Government's ultimate burden of proving beyond a reasonable doubt the defendant's guilt, including *his power, in light of the duty imposed by the Act, to prevent or correct the prohibited condition.*" 421 U.S. at 673, 95 S.Ct. at 1913 (emphasis added).

It is not easy to ascertain from this passage the exact nature and scope of the impossibility defense.

One interpretation of the impossibility defense is that it relates *only* to the power of the corporate officer, by virtue of his position in the corporation, to correct or prevent violations of the Act. Under this interpretation, the evidence introduced by the defendant at trial to sustain his impossibility defense would serve only to rebut the evidence introduced by the government in establishing its prima facie case. Both sides would direct their proof to the responsible relationship *vel non* which the defendant bore to the violations of the Act. That this interpretation is what the Court intended is suggested by both the second and third italicized sections above, focusing on the defendant's "power . . . to prevent or correct the prohibited condition." The Supreme Court used much the same terms to define "responsible relationship." Under this interpretation, then, the impossibility defense would not serve as an affirmative defense, but would merely provide corporate officers a defense open to all who are criminally accused, that is, rebuttal of the government's proof.

An alternative interpretation of the impossibility defense is that it is satisfied by evidence that the corporate officer exercised "extraordinary care" and was still unable to prevent the violations. Under this interpretation, the impossibility defense would serve as an affirmative defense, incorporating an objective element—use of extraordinary care—into a strict liability offense. That this interpretation is what the *Park* Court intended is suggested by the Court's insistence that "the Act, in its criminal aspect, does not require that which is objectively impossible." This interpretation is also suggested by the Court's repeated emphasis that corporate officers must exercise the "highest standard of foresight and vigilance", *id.* at 672, 673, 95 S.Ct. at 1913, and the "highest standard of care," *id.* at 676, 95 S.Ct. at 1913. The *Park* Court's citation to *United States v. Wiesenfeld Warehouse Co.,* 376 U.S. 86, 84 S.Ct. 559, 11 L.Ed.2d 536 (1964), is also illuminating. In *Wiesenfeld,* the Court first suggested the existence of the impossibility defense, stating that "one 'who is, by the very nature of his business powerless' to protect against this kind of contamination, however high the standard of care exercised" may raise such defense at trial. *Id.* at 91, 84 S.Ct. at 563. *Wiesenfeld* clearly suggests that a corporate officer who exercises extraordinary care and still is unable to prevent violations of the Act will not be held criminally culpable. Finally, further support for this second interpretation of the impossibility defense can also be found in the Court's suggestion that a corporate officer who introduces sufficient evidence of impossibility is entitled, upon request, to a jury instruction that the government is required to prove beyond a reasonable doubt that the defendant was not without the power or capacity to affect the conditions which

founded the charges in the information. 421 U.S. at 676–77, 95 S.Ct. at 1913–14. This suggests a separate and distinct burden on the government to disprove an affirmative defense of impossibility, at least once sufficient evidence has been introduced by the defendant to raise that defense.

On balance, although support can also be found for the first interpretation of the impossibility defense in the language of *Park*, it appears that the second interpretation is the proper one. Moreover, this interpretation appears to be in accord with the two cases which have considered the impossibility defense since *Park*, *United States v. Y. Hata & Co.*, 535 F.2d 508, 510–12 (9th Cir.), *cert. denied*, 429 U.S. 828, 97 S.Ct. 87, 50 L.Ed.2d 92 (1976); *United States v. Starr*, 535 F.2d 512, 515–16 (9th Cir. 1976); *cf. United States v. Corbin Farm Service*, 444 F.Supp. 510, 536 (E.D.Cal.) (applying impossibility defense to the Migratory Bird Treaty Act, 16 U.S.C. §§ 703 *et seq.*), *aff'd on other grounds*, 578 F.2d 259 (9th Cir. 1978), and with legal commentary, *Developments in the Law—Corporate Crime: Regulating Corporate Behavior Through Criminal Sanctions*, 92 Harv.L.Rev. 1227, 1262–65 & nn. 106 & 107 (1979); O'Keefe, Criminal Liability: *Park* Update, 32 Food Drug Cosm. L.J. 392, 395 (1977). In light of the severe penalties which may be imposed for a second conviction under the Act, 21 U.S. C.A. § 333,[4] I am inclined to adopt this more lenient interpretation of the impossibility defense. *Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971); *See United States v. United States Gypsum Co.*, 438 U.S. 422, 437–38, 442 n.18, 98 S.Ct. 2864, 2873–74, 2876 n.18, 57 L.Ed.2d 854 (1978); *Morissette v. United States*, 342 U.S. 246, 254 n.14, 256, 72 S.Ct. 240, 245 n.14, 246, 96 L.Ed. 288 (1952).

In sum, the impossibility defense allows the corporate officer to introduce evidence to establish an affirmative defense that he exercised extraordinary care and still could not prevent violations of the Act. The defense is raised when the defendant introduces a sufficient quantum of evidence as to his exercise of "extraordinary care" so as to justify placing an additional burden on the government. At this point, the government must prove beyond a reasonable doubt that the defendant, by the use of extraordinary care, was not without the power or capacity to correct or prevent the violations of the Act.[5]

Turning to the record of the instant case, I rule that it is impossible to determine whether the magistrate applied the proper legal standard. His comment that the "court is further satisfied that it was not 'objectively impossible' to maintain the warehouse in a sanitary condition" can be read either as a finding that the defendant did not introduce sufficient evidence to raise the impossibility defense, or as a finding that, although the defendant introduced sufficient evidence to raise the defense, the government sustained its additional burden to disprove the defense. If the latter, the magistrate's finding is legally deficient because he does not state that the government sustained its burden beyond a reasonable doubt. Because of this uncertainty in the magistrate's finding on the impossibility defense, the convictions of Joel Leavitt and Julian Schultz are also reversed. On remand, the magistrate is to make a finding as to these two defendants whether they introduced sufficient evidence to raise the impossibility defense,[6] and, if so, whether the government sustained its burden of dis-

---

**4.** Section 303 of the Act, 21 U.S.C. § 333, provides in relevant part:

"(b) Notwithstanding the provisions of subsection (a) of this section, if any person commits such a violation after a conviction of him under this section has become final, or commits such a violation with the intent to defraud or mislead, such person shall be imprisoned for not more than three years or fined not more than $10,000, or both."

**5.** Of course, the corporate officer may always introduce evidence that by reason of his corporate position he did not have the power to prevent or correct violations of the Act, and thereby rebut the government's proof on his "responsible relationship" with the violations.

**6.** In determining whether the impossibility defense has been properly raised, and if raised, disproved, the magistrate should look to the following cases. *United States v. Y. Hata Co.*,

proving the defense beyond a reasonable doubt. And, if the magistrate determines on remand that defendant Julian Leavitt bore a responsible relationship with the violations charged in the information, he should also determine whether Julian Leavitt succeeded on his impossibility defense. The magistrate is to make clear the evidentiary basis for his findings.[7]

### III

The defendants' remaining arguments on appeal relate to the denial of their motion to suppress evidence gained during two warrantless administrative inspections of their warehouse. These warrantless inspections, conducted pursuant to the authority granted by 21 U.S.C. § 374,[8] took place in January and June of 1975; the FDA investigators discovered evidence of rodent infestation and took various product samples for testing.

The defendants first contend that the warrantless inspections violated their Fourth Amendment rights. The defendants raised this argument in their motion to suppress prior to trial. On September 1, 1977, the magistrate ruled that, under the rationale of *United States v. Biswell*, 406

U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), which sanctioned warrantless searches in certain "pervasively regulated" industries, warrants are not required for inspections conducted pursuant to § 374. Nevertheless, the magistrate suppressed the evidence obtained from the June investigation because he found that the focus of the investigation had changed from a routine administrative inspection to a criminal investigation and the defendants had not received *Miranda* warnings. On interlocutory appeal pursuant to Rule 5 of the *Rules of Procedure for the Trial of Minor Offenses Before United States Magistrates* this Court agreed with the magistrate's ruling that *Biswell* applies to inspections under § 374 and therefore that neither a warrant or consent is required, *United States v. New England Grocer Supply Co.*, 442 F.Supp. 47, 48 (D.Mass.1977); however, the Court reversed the magistrate's ruling that *Miranda* warnings were required during the June inspection. *Id.* at 49. The defendants now ask this Court to reconsider its previous ruling as to the applicability of *Biswell* to § 374 inspections, based primarily on the Supreme Court's recent decision in *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978).

535 F.2d 508, 510–12 (9th Cir.), *cert. denied*, 429 U.S. 828, 97 S.Ct. 87, 50 L.Ed.2d 92 (1976); *United States v. Starr*, 535 F.2d 512, 515–16 (9th Cir. 1976); *United States v. Hammond Milling Co.*, 413 F.2d 608, 612 (5th Cir. 1969), *cert. denied*, 396 U.S. 1002, 90 S.Ct. 552, 24 L.Ed.2d 494 (1970). *See also Kadis v. United States*, 373 F.2d 370, 373–74 (1st Cir. 1967); *United States v. Jett*, 491 F.2d 1078, 1079–80 (1st Cir. 1974) (cases discussing what evidence necessary to raise and rebut the affirmative defense of entrapment). *See generally* Development in the Law, *supra*, 92 Harv.L.Rev. at 1265–66.

The narrow scope which the *Park* Court intended the impossibility defense to have is indicated by the discussion in footnote 19 of the opinion:

"Assuming, *arguendo*, that it would be objectively impossible for a senior corporate agent to control fully day-to-day conditions in 874 retail outlets, it does not follow that such a corporate agent could not prevent or remedy promptly violations of elementary sanitary conditions in 16 regional warehouses." 421 U.S. at 678, n.19, 95 S.Ct. at 1914.

**7.** On September 26, 1979, 125 Cong.Rec. S13452–83, the Senate passed a bill to lower the standard of liability under the Federal Food, Drug, and Cosmetic Act to negligence. Drug Regulation Reform Act of 1979, S.1075, 96th Cong., 1st Sess. § 106 (1979).

**8.** Section 704 of the Act, 21 U.S.C. § 374, provides in relevant part:

"(a) For purposes of enforcement of this chapter, officers or employees duly designated by the Secretary, upon presenting appropriate credentials and a written notice to the owner, operator, or agent in charge, are authorized (1) to enter, at reasonable times, any factory, warehouse, or establishment in which food, drugs, devices, or cosmetics are manufactured, processed, packed, or held for introduction into interstate commerce or after such introduction, or to enter any vehicle being used to transport or hold such food, drugs, devices, or cosmetics in interstate commerce; and (2) to inspect, at reasonable times and within reasonable limits and in a reasonable manner, such factory, warehouse, establishment, or vehicle and all pertinent equipment, finished and unfinished materials; containers, and labeling therein."

■ In *Barlow's*, the Court held that the warrantless searches authorized by § 8(a) of the Occupational Safety and Health Act, 29 U.S.C. § 657(a), violated the Fourth Amendment. In so doing, however, the Court expressly left intact the exception to the warrant requirement recognized in *Biswell* and *Colonnade Catering Corp. v. United States*, 397 U.S. 72 (1970), for closely regulated industries. 436 U.S. at 313, 98 S.Ct. at 1820. In those cases, the *Barlow's* Court explained, warrantless searches were upheld because a businessman voluntarily entering a closely regulated industry can have "no reasonable expectation of privacy," and "in effect consents to the restrictions placed upon him." *Id.* Although the Court did not indicate what industries other than firearms (*Biswell*) and liquor (*Colonnade*) might fall within the exception to the warrant requirement, it noted that some regulatory statutes "apply only to a single industry, where regulations might already be so pervasive that a *Colonnade-Biswell* exception to the warrant requirement could apply." *Id.* at 321, 98 S.Ct. at 1825. The *Barlow's* Court also stated that the reasonableness of a warrantless search provision in a regulatory statute "will depend on the specific enforcement needs and privacy guarantees of each statute." *Id.*

After the Court's decision in *Biswell* and prior to its decision in *Barlow's*, the weight of authority upheld the constitutionality of the warrantless inspections authorized by § 374. *United States v. Acri Wholesale Grocery Co.*, 409 F.Supp. 529, 533 (S.D.Iowa 1976); *United States v. Business Builders, Inc.*, 354 F.Supp. 141, 143 (N.D.Okl.1973); *United States v. Del Campo Baking Mfg. Co.*, 345 F.Supp. 1371, 1376 (D.Del.1972); *contra United States v. Litvin*, 353 F.Supp. 1333, 1338 (D.D.C.1973). Contrary to the only other post-*Barlow's* decision thus far

considering the constitutionality of § 374, *United States v. Roux Laboratories, Inc.*, 456 F.Supp. 973, 977 n.2 (M.D.Fla.1978), I do not read *Barlow's* as requiring a knee-jerk invalidation of the warrantless inspections authorized by § 374. *Cf. Marshall v. Nolichuckey Sand Co.*, 606 F.2d 693, 694–96 (6th Cir. 1979); *Marshall v. Stoudt's Ferry Preparation Co.*, 602 F.2d 589, 592–94 (3rd Cir. 1979), *cert. denied*, —— U.S. ——, 100 S.Ct. 665, 62 L.Ed.2d 644 (1980); *Marshall v. Donofrio*, 465 F.Supp. 838, 841–43 (E.D.Pa. 1978), *aff'd*, 605 F.2d 1196 (3d Cir. 1979) (post-*Barlow's* cases holding that the warrantless inspection provision of the Federal Mine Safety and Health Amendments Act of 1977, 30 U.S.C. § 813(a), does not violate the Fourth Amendment). Rather, given the pervasive nature and long history of federal regulation of the food and drug industry, considering that, in contrast to the situation in *Barlow's*, these regulations apply to a particular industry and not a wide range of business establishments, and mindful of the urgent public health interests that are served by the inspections,[9] I rule that warrantless inspections pursuant to § 374 are fully consistent with the Fourth Amendment. Therefore, neither a warrant or consent was required to conduct the inspections of defendants' warehouse.

■ Defendants make several other contentions with regard to the denial of their motion to suppress. First, the defendants argue that the warrantless inspections were invalid because the FDA agents did not secure the defendants' consent. Because of my ruling that the *Biswell* rationale applies to warrantless inspections conducted pursuant to § 374, I need not consider whether the defendants, in fact, consented to the inspections. The defendants next contend that, even if no warrant or consent was

9. In this regard, the statement by the court in *United States v. Business Builders, Inc.*, 354 F.Supp. 141 (N.D.Okl.1973), is particularly pertinent:

"It would be an affront to common sense to say that the public interest is not as deeply involved in the regulation of the food industry as it is in the liquor and firearms industries. One need only to call to mind recent

cases of deaths occurring from botulism. Modern commerce has devised such an efficient and rapid means of distribution of food products to the consumer that a batch of contaminated food may cause widespread illness and death before the public can be warned and the contaminated products removed from the market." *Id.* at 143 (footnote omitted).

required initially, the warrantless inspections became unreasonable under the Fourth Amendment once the FDA agents had probable cause to suspect violations of the Act. As to this contention, I rule that the FDA agents were not required to suspend the valid warrantless inspections and secure a warrant once they had reason to suspect violations of the Act, so long as the searches were otherwise reasonable in time, manner, and scope as required by § 374.

Defendants' final contention is that the inspections did not comply with § 374, both because the FDA agents did not initiate the inspections by presenting a written notice to the "owner, operator, or agent in charge" and because the inspections were "unreasonable" in time, manner, and scope. As to the first part of this argument, it is relevant that the FDA agent commenced each inspection by asking to see the person most responsible or the person in charge. In January, the agent was directed to David Ginsberg, vice-president of purchasing, whereupon he presented his credentials and issued a notice of inspection to both Mr. Ginsberg and James Kaminsky, the warehouse sanitation officer. In June, the agent presented his credentials and issued a notice of inspection to Peter DeGannaro, the assistant treasurer. I rule that Ginsberg, Kaminsky, and DeGannaro were all "agents" within the meaning of § 374 since they were "responsible representatives of management." *See* S.Rep.No. 712, 83d Cong., 1st Sess., *reprinted in* 2 U.S.Code Cong. & Admin.News, pp. 2198, 2203 (1953). The second part of defendants' argument with regard to § 374 is that the inspections were unreasonable in time, manner, and scope and were nothing more than "fishing expeditions." Although both the January and June inspections extended over a period of approximately five days, that period was not unreasonable in light of the very large size of defendants' warehouse. Moreover, in assessing reasonableness it is relevant that the inspections occurred during normal business and apparently did not interfere with the normal course of business. *Durovic v. Palmer*, 342 F.2d 634, 636 (7th Cir. 1965). Based on

these considerations, I rule that the inspections were not unreasonable. In all material respects, the inspections complied with the dictates of § 374.

In sum, the Court rules that the evidence obtained from the January and June inspections was properly admitted at the trial of defendants, and may be considered by the magistrate on remand.