**UNITED STATES of America,**

v.

**GEL SPICE CO., INC., Barry Engel and Andre S. Engel, Defendants.**

**No. 80 CR 650.**

United States District Court,
E.D. New York.

Dec. 21, 1984.

See also D.C., 601 F.Supp. 1214.

U.S. Dept. of Justice, for the U.S.; Raymond W. Philipps, Beverly S. Nash, Washington, D.C., of counsel.

Friend, Dorfman & Marks, New York City, for defendants Gel Spice Co. and Barry Engel; Jerold W. Dorfman, New York City, of counsel.

Perles & Albert, New York City, for defendant Andre S. Engel; David A. Beale, New York City, of counsel.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

This criminal prosecution under the Federal Food, Drug and Cosmetic Act (the "Act"), 21 U.S.C. §§ 301 *et seq.*, was initiated with the filing of a ten-count Informa-tion on December 3, 1980. The information charges Gel Spice Co., Inc. ("Gel Spice"), its President, Barry Engel, and its Vice-President, Andre S. Engel, with causing various articles of food that had been shipped in interstate commerce to be held for sale in a building accessible to rodents, thereby exposing the food to contamination of rodent filth. This, it is charged, resulted in the food becoming adulterated (a) within the meaning of 21 U.S.C. § 342(a)(4) (1976),[1] in that various lots of food were held under insanitary conditions whereby they may have become contaminated with filth (all Counts); and (b) within the meaning of 21 U.S.C. § 342(a)(3) (1976),[2] in that the food consisted in part of a filthy substance by reason of the presence therein of rodent excreta pellets, rodent gnawings, rodent hair or rodent urine (Counts I, II, III and VIII). Proof of either charge is a violation of 21 U.S.C. § 331(k) (1976),[3] which prohibits the doing of any act that results in food becoming adulterated while being held for sale after shipment in interstate commerce.

Each Count of this Information is predicated upon inspections by employees of the United States Food and Drug Administration ("FDA") of the McDonald Avenue, Brooklyn, N.Y., food warehouse operated by Gel Spice. Counts I and II arise from an FDA inspection in July 1976; Counts IV and V from an inspection in March 1977; Counts III, VI and VII from an inspection in July 1977; and Counts VIII, IX and X from an inspection in January 1979. The corporation and Barry Engel are named in all ten counts; Andre Engel is named in Counts I through VII.

---

1. Subsection (a)(4) of 21 U.S.C. § 342 (1976) provides: "A food shall be deemed to be adulterated ... (a)(4) if it has been prepared, packed or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health ...."

2. Subsection (a)(3) provides: "A food shall be deemed to be adulterated ... (a)(3) if it consists in whole or in part of any filthy, putrid or decomposed substance, or if it is otherwise unfit for food ...."

3. Subsection (k) of 21 U.S.C. § 331 provides: "The following acts and the causing thereof are hereby prohibited: ... the doing of any ... act with respect to, a food ... if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated."

After a lengthy period of discovery and motion practice,[4] a bench trial was held on February 29, March 1, 2 and 5, 1984. Extensive briefs and memoranda were subsequently filed. The following constitute the Court's findings of fact and conclusions of law. Fed.R.Crim.P. 23(c).

*Findings of Fact*

Gel Spice was incorporated under the laws of New York State in 1955. Since 1969 it has had an office and warehouse at 593 McDonald Avenue, Brooklyn, New York. Gel Spice imports, processes, and packages spices. The processing involves grinding, blowing, sifting, and repackaging the spices into consumer and industrial size containers.

Barry Engel has been the President of Gel Spice since 1963, and is responsible for the purchasing of spices and their storing, processing and packaging at the McDonald Avenue facility. His brother, Andre Engel, is responsible for sales. Their mother, Margaret Engel, handles the financial operation of the company. All have equal shares in Gel Spice and may sign checks and documents on behalf of the company.

The McDonald Avenue facility is 300' × 125' × 14' and is divided into five separate areas: A large main raw materials storage room for receiving and storing spices; an adjacent production room for processing the spices, and next to that a packaging materials storage room. There are, in addition, an office area on the McDonald Avenue side of the production room and a cool room on the McDonald Avenue side of the packaging materials storage room. Two sliding garage doors open on to McDonald Avenue, one in the main storage room and the other in the packaging materials storage room.[5]

Gel Spice imports spices from abroad, particularly from South America, Europe and the Middle East. The spices are imported by ship and unloaded at piers. When the spices arrive, an official sampler from an outside firm is sent by Gel Spice to take a random sample from the bags.

The sampler follows procedures and standards published by the American Spice Trade Association and the sample is tested for Gel Spice by an independent laboratory using those standards. Gel Spice's decisions regarding the acceptance and use of

---

4. Defendants made several motions to suppress evidence and to dismiss certain counts of the Information. These were referred to the Magistrate for Report and Recommendation. 28 U.S.C. § 636(b). Magistrate Chrein of the Court submitted both an Interim and Final Report and Recommendation, copies of which are annexed to this Opinion. Defendants filed objections, and this Court ruled orally on them. A copy of the Memorandum and Order embodying that oral ruling is also annexed to this Opinion.

5. The warehouse is as appears below:

```
┌──────────┬──────────────┬──────────────┐
│ Packaging│  Production  │  Main        │
│ Material │     Room     │    Storage   │
│  Storage │              │      Room    │
│          │              │              │
│          │              │              │
│  ┌────┐  │  ┌────────┐  │              │
│  │Cool Room│ │ Office │  │              │
└──┴────────┴─┴────────┴──┴──────────────┘
```

**McDONALD AVENUE**

the merchandise are based on the results of that test. It is notable that no examination is made at the pier of the outside of the bags, and only a random number of bags have samples drawn from within.

If the sampled spices pass the pier inspection, then the entire shipment is brought to the McDonald Avenue warehouse. Everyone in the trade knows that imported spices can arrive at the Gel Spice facility in a contaminated state; accordingly, measures must be taken to avoid bringing rodents into the building. When the spices arrive, a Gel Spice employee looks for evidence of rodent activity. Employees also scan the bags with a "black light" that will expose possible urine stains. At any given time, there may be 10,000 or more bags of spice stored at Gel's premises.

From 1976 through 1979 Gel Spice had an ongoing sanitation and rodent control program. The firm once used DDT before that insecticide was banned. DDT was quite efficient. The insecticide was spread around the doorways and around the plant and no mice would cross the DDT to come into the building. When DDT was banned, the company's exterminator recommended bait stations, traps, and then glue boards. Bait stations involve the use of poisoned food; traps catch the rodents.

Continuing their effort to develop an effective sanitation program, defendants retained various firms, all of whom promised satisfactory results. Between 1974 and 1979 Gel Spice had four different outside exterminators, who would come once each week or every two weeks. During this period, Gel Spice was inspected four times by the FDA. Those inspections form the basis of this Information.

### A. The July 1976 Inspection (Counts I, II)

In July 1976 FDA Investigators Thomas Gardine and Brian Landesberg inspected the McDonald Avenue warehouse. They examined a lot of chili peppers in the warehouse's cool room. Inspector Gardine saw several dead rodents on bags of a different spice next to the lot of chili peppers. He also observed several dead rodents on the floor, one of which was covered with maggots and which, in Gardine's opinion, had been decomposing for at least one week. Throughout various areas of the cool room Inspector Gardine observed rodent excreta pellets. Burlap cuttings from the bags of chili pepper tested positively for mammalian urine, as did samples of the peppers themselves.

In the raw material storage room Inspector Gardine examined a lot of sesame seed, which forms the basis of Count II of the Information. He observed a decomposing rodent along the east wall of that room, and what appeared to be a rodent gnaw hole through one of the bags to the sesame seed. Burlap cuttings from various bags tested positively for mammalian urine, as did samples of the sesame seed. Several product samples also tested positively for rodent excreta.

On the other side of the warehouse, in the packaging materials storage room, Gardine observed several decomposing rodents, both in and out of bait boxes. Additionally, he saw numerous access holes for rodents throughout the warehouse.

### B. The March 1977 Inspection (Counts IV, V)

Counts IV and V of the Information arise out of a March 1977 inspection of lots of marjoram and basil. Investigator Edward Miracco testified that the marjoram was in the main storage room. On the bags of marjoram, Miracco found rodent excreta pellets and numerous dead beetle-like insects. Sifting through the marjoram itself, Miracco found dead insects. Samples of marjoram later tested positively for rodent excreta pellets and red flour beetles.

Miracco also examined a lot of basil, finding rodent excreta pellets on six of the 34 bags he inspected. Burlap cuttings from seven of the bags tested positively for mammalian urine. On the floor of the main storage room was spilled sodium bisulfate; Miracco saw rodent tracks through the chemical. He also saw a hole

in a sliding door opening from the area adjacent to the cool room on to McDonald Avenue.

### C. The July 1977 Inspection (Counts III, VI, VII)

Counts III, VI and VII arise respectively from a July 1977 FDA Inspection of lots of arrowroot flour, sesame seed and whole chili pepper. The arrowroot flour was in the main storage room. Investigator Bodner observed rodent pellets on and around the various bags. Rodent hairs were found around a gnaw hole in one bag, and 28 different cuttings tested positively for mammalian urine.

The sesame seed was stored in the cool room. Rodent pellets were scattered throughout the various bags of seed, and one pellet was lying on sesame seed in a torn bag. Eight samples of burlap bag cuttings tested positively for mammalian urine, and thirteen samples of the sesame seed itself tested positively for rodent pellets. Also stored in the cool room was a lot of whole chili pepper. There were many rodent excreta pellets on and around the bags.

In the course of this inspection, Investigators Bodner and Lesser observed other signs of rodent activity throughout the plant: live rodents; a dead rodent; and rodent excreta pellets. Four bait boxes had no bait in them and the hole in the sliding door to McDonald Avenue, first noticed by Investigator Miracco in the March 1977 inspection, still had not been closed.

### D. The January 1979 Inspection (Counts VIII, IX, X)

The final FDA Inspection of Gel Spice's warehouse occurred in January 1979. Examinations of lots of basil, aniseed and bay leaves led to Counts VIII, IX and X of the Information.

Investigator Richard Pecora inspected a lot of basil, which was stored in the main storage room. He observed more than 300 rodent pellets on the bags and surrounding floor. He also observed, and photographed, four live rodents nesting inside one of the bags of basil. From that bag he extracted a sample of basil, which was found to contain rodent hair and excreta as well as nesting material.

Also located in the main storage room was the aniseed involved in Count IX. Pecora counted over 200 rodent excreta pellets on and around the bags of aniseed. He found the remnants of a rodent's nest in one of the bags, as well as a roll of toilet paper, which appeared to have been gnawed by a rodent, on the floor next to the bag.

Finally, Pecora inspected a lot of bay leaves, which was stored approximately 30 feet from the aniseed. He discovered rodent excreta pellets on the bags, and a 7.6 ounce sample of bay leaf contained two more rodent pellets. A general inspection of the entire warehouse revealed more rodent pellets, a decomposed rodent in the cool room, and open drums of spices as well as spilled spices.

### Conclusions of Law

The information charges ten violations of 21 U.S.C. § 331(k). These charges may be proven by showing the following: (1) the articles involved in the Information were food; (2) they were held for sale by Gel Spice after shipment in interstate commerce; and (3) the articles were adulterated within the meaning of either 21 U.S.C. § 342(a)(3) or § (a)(4). There is no dispute regarding the first two elements of the offense. The case, therefore, turns on whether the government has proven the third element beyond a reasonable doubt. There is also a question as to the applicability of certain defenses.

### A. Corporate Liability

All ten counts of the Information charge Gel Spice Co. with violating 21 U.S.C. § 342(a)(4), which states that food shall be deemed adulterated "if it has been prepared, packed or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health."

To prove a violation of this subsection, the government need only prove that the food was held under insanitary conditions, creating a reasonable possibility of contamination; proof of actual contamination is not required. *See United States v. Wiesenfeld Warehouse Co.*, 376 U.S. 86, 90–91, 84 S.Ct. 559, 562–563, 11 L.Ed.2d 536 (1964); *accord Berger v. United States*, 200 F.2d 818, 821 (8th Cir.1952). Proof of actual contamination is, however, evidence that the food has been held under insanitary conditions. *Id.* at 823. Moreover, when insanitary conditions are adjacent to food there exists a reasonable possibility that the food may become contaminated. *United States v. Cassaro, Inc.*, 443 F.2d 153, 157 (1st Cir.1971).

■ Filth, as that term is used in §§ 342(a)(3) and § 342(a)(4), is given its common meaning. *United States v. Cassaro, Inc., supra*, 443 F.2d at 156. It is defined as "foul matter; offensive or disgusting." Random House, Inc., *Dictionary of the English Language Unabridged* 53 (1966). Thus, food is adulterated within the meaning of § 342(a)(4) when it is stored in conditions creating a reasonable possibility that it may become contaminated with foul, offensive or disgusting matter.

■ Applying this standard, the evidence that Gel Spice violated § 342(a)(4) is overwhelming. The testimony of the F.D.A. investigators, corroborated by the results of laboratory analyses and by graphic photographs, proves beyond a reasonable doubt that Gel Spice held food for sale after it had been shipped in interstate commerce, under conditions whereby it may have become adulterated with filth. Accordingly, I find the corporate defendant, Gel Spice Co., guilty of ten counts of violating § 331(k), by violating § 342(a)(4).[6]

**B.** *Individual Liability*

Defendant Barry Engel, President of Gel Spice Co., is named in all ten counts of the Information. His brother, Andre Engel, is Vice President of Gel Spice Co. and is named in Counts I through VII of the Information. For the reasons developed below, I find Barry Engel guilty and Andre Engel not guilty of all counts charged against them.

■ Under the Act, individual culpability for criminal acts of a business attaches to any person who exercises responsibility in the conduct of the business, whether or not the individual intended to violate the law or knew of the violative acts. All the government must prove is that the individual was in a position of power or authority to prevent, detect or correct violations of the Act. *United States v. Park*, 421 U.S. 658, 670–71, 95 S.Ct. 1903, 1910–11, 44 L.Ed.2d 489 (1975); *United States v. Dotterweich*, 320 U.S. 277, 284–85, 64 S.Ct. 134, 138–39, 88 L.Ed. 48 (1943); *United States v. Torigian Laboratories*, 577 F.Supp. 1514, 1529 (E.D. N.Y.), *aff'd mem.*, 751 F.2d 373 (2d Cir. 1984).

The Act "dispenses with the need to prove 'consciousness of wrongdoing.'" *United States v. Park, supra*, 421 U.S. at 669, 95 S.Ct. at 1910. As the Supreme Court stated in *Park:*

> [I]n providing sanctions which reach and touch the individuals who execute the corporate mission ... the Act imposes not only a positive duty to seek out and remedy violations when they occur but also, and primarily, a duty to implement measures that will insure that violations will not occur.

> •    •    •    •    •

> [T]he Government establishes a prima facie case when it introduces evidence sufficient to warrant a finding by the trier of the facts that the defendant had, by reason of his position in the corporation, responsibility and authority either to prevent in the first instance, or promptly to correct, the violation complained of, and

---

**6.** Because the evidence clearly establishes violations of § 331(k) flowing from violations of § 342(a)(4), there is no need to make any findings regarding defendants' guilt based on violations of § 342(a)(3). Proof of the § 342(a)(4) violation alone is sufficient to establish a violation of § 331(k).

that he failed to do so. The failure thus to fulfill the duty imposed by the interaction of the corporate agent's authority and the statute furnishes a sufficient causal link. The considerations which prompted the imposition of this duty, and the scope of the duty, provide the measure of culpability.

Id. at 672–74, 95 S.Ct. at 1911–13. (citations omitted).

■ The government's proof at trial demonstrated beyond a reasonable doubt that Barry Engel was in a position of authority in the corporation to prevent or correct violations of the Act and that he did not do so. He was not "powerless to prevent or correct the violation[s]." *Id.* at 673, 95 S.Ct. at 1912.

Barry Engel testified that he was principally responsible for plant sanitation. He also admitted this to Investigator Gardine. Although there was testimony that day-to-day plant management is delegated to Mr. Jonas Grunzweig, the evidence is clear that Mr. Grunzweig reported to Barry Engel, that Barry Engel decided what methods of sanitation were to be used, and that Barry Engel controlled the hiring and firing of outside exterminators. Barry Engel was in a position of responsibility and authority to control the insanitary conditions at Gel Spice Co. *United States v. Park, supra,* 421 U.S. at 670–71, 95 S.Ct. at 1910–11. He is guilty of violating 21 U.S.C. § 331(k), as charged in all ten counts of the Information, because he did not exercise his responsibility and authority to control violations of § 342(a)(4) at the Gel Spice plant.

■ The government has not proved beyond a reasonable doubt that Andre Engel had the requisite responsibility and authority to warrant a finding of guilt against him. The government makes much of Andre Engel's position as Vice President, and the fact that he was present at the warehouse during the three inspections on which the Counts against him are predicated. Guilt may not be assigned, however, solely by virtue of a defendant's corporate position. *United States v. New England Grocers Supply Co.,* 488 F.Supp.

230, 232 (D.Mass.1980) (citing *United States v. Park, supra* ). Moreover, while Andre Engel was indeed present during three inspections, the FDA investigators were repeatedly told that he was filling in for Barry Engel, that Andre's primary responsibility was sales, and that Barry was the person in charge of plant operation and sanitation. There is more than a reasonable doubt that Andre Engel had responsibility and authority to control sanitary conditions at Gel Spice Co. Accordingly, I find Andre Engel not guilty of the charges contained against him in Counts I through VII.

### C. *The Impossibility Defense*

Defendants contend that even if conditions at the warehouse were insanitary within the meaning of the Act, those conditions were impossible to prevent, and thus defendants are not guilty of violating § 342(a)(4). I find that defendants have not established the defense of impossibility.

The impossibility defense derives from the Supreme Court's discussion in *United States v. Park,* 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975), of the criminal liability of corporate agents for violations of the Act:

The duty imposed by Congress on responsible corporate agents is, we emphasize, one that requires the highest standard of foresight and vigilance, but the Act, in its criminal aspect, does not require that which is objectively impossible. The theory upon which responsible corporate agents are held criminally accountable for "causing" violations of the Act permits a claim that a defendant was "powerless" to prevent or correct the violation to "be raised defensively at a trial on the merits." *United States v. Wiesenfeld Warehouse Co.,* 376 U.S. 86, 91, 84 S.Ct. 559, 563, 11 L.Ed.2d 536 (1964).

*Id.* at 673, 95 S.Ct. at 1912.

■ Courts interpreting *Park* have assumed, without deciding, that the impossibility defense is available only to individuals. *See United States v. Starr,* 535 F.2d

512, 515–16 (9th Cir.1976); *United States v. New England Grocers Supply Co., supra,* 488 F.Supp. at 236. The context of the Supreme Court's discussion in *Park,* and the reference to the Court's earlier decision in *United States v. Wiesenfeld Warehouse Co.,* 376 U.S. 86, 91, 84 S.Ct. 559, 563, 11 L.Ed.2d 536 (1964) lead me to conclude that the impossibility defense is not available to a corporation. While the defense is available to Barry Engel, I find that he has not offered sufficient evidence to make it a genuine issue in this case and that, therefore, is it not a defense to Barry Engel or, a fortiori, to the corporation (assuming it were available to the latter).

■ To establish the impossibility defense the corporate officer must introduce evidence that he exercised extraordinary care, but was nevertheless unable to prevent violations of the Act. The defense is raised when defendant introduces sufficient evidence of the exercise of extraordinary care to justify placing an additional burden on the government—that of proving beyond a reasonable doubt that had defendant indeed exercised such extraordinary care, he could have prevented or corrected those violations. *United States v. New England Grocers Supply Co., supra,* 488 F.Supp. at 234; *see United States v. Wiesenfeld Warehouse Co., supra,* 376 U.S. at 91, 84 S.Ct. at 563.

The evidence is clear that, notwithstanding Barry Engel's protestations to the contrary, he did not exercise "extraordinary care"· in administering Gel Spice's sanitation program. The shocking amount of rodent filth observed during the four inspections, including live maggots, the remains of dead rodents, and rodent nesting material belies any claim that the exercise of extraordinary care would not have re-

sulted in the removal of much of this filth.[7] Additionally, the FDA investigators observed untended bait boxes, and numerous rodent access holes throughout the plant, such as broken windows, cracks in walls, and a hole in the sliding door opening on to McDonald Avenue. Barry Engel, President of Gel Spice and responsible for its sanitation program, was clearly not "powerless to protect against this kind of contamination." *United States v. Wiesenfeld Warehouse Co., supra,* 376 U.S. at 91, 84 S.Ct. at 563.

Although defendants did introduce evidence of an ongoing rodent control program, that program did not constitute the extraordinary care required to establish the impossibility defense. Defendants passed an FDA inspection in 1972, and there is no evidence that the spice trade or the conditions surrounding the Gel Spice warehouse changed so much after 1972 that it became impossible for them to control rodent activity inside the warehouse. Indeed, defendants' own pictures of the warehouse, taken shortly before trial and introduced as exhibits (DX A101–A200), portray the warehouse as far cleaner than when it was inspected by the FDA between 1976 and 1979. Because defendants did not raise a genuine issue of impossibility, no additional burden was placed on the government.[8]

For the foregoing reasons, I find defendants Gel Spice Company and Barry Engel guilty of all ten Counts of the Information, which charged them with violating 21 U.S.C. § 331(k) in that they held food that had been shipped in interstate commerce for sale, in an adulterated condition as defined in 21 U.S.C. § 342(a)(4). I find defendant Andre Engel not guilty of violating 21 U.S.C. § 331(k). Because of my finding that defendants violated § 331(k) by violat-

---

7. Defendants assail the government for not introducing evidence of what other steps defend-.ants should have taken to insure compliance with the Act. Defendants overlook, however, that impossibility is an affirmative defense, and that the burden of producing evidence of extraordinary care rests on defendants.

8. Because of my finding that defendants' guilt flows from violations of § 342(a)(4), there is no need to discuss the *de minimis* defense urged by defendants. That defense, if available at all, applies to charges of actual adulteration under § 342(a)(3). *See United States v. Certified Grocers Co-op,* 546 F.2d 1308, 1312 (7th Cir.1976); *United States v. Capital City Foods,* 345 F.Supp. 277, 278 (D.N.D.1972).

ing § 342(a)(4), I need not discuss violations of § 342(a)(3).

Defendants shall report forthwith to the Probation Department. Sentencing shall take place at 10:00 a.m., February 8, 1985. At that time the Court will rule on the government's request to tax the full costs of this prosecution against defendants. 28 U.S.C. §§ 1918(b), 1920. The government is directed to furnish the Court and defendants with an itemization of the requested costs not later than January 18, 1985.

SO ORDERED.