**UNITED STATES of America, Plaintiff,**

v.

**TORIGIAN LABORATORIES, INC., and Puzant C. Torigian, Defendants.**

No. 81 Cr. 598.

United States District Court,
E.D. New York.

Jan. 18, 1984.

David G. Adams, Associate Chief Counsel for Enforcement, U.S. Food and Drug Administration, Rockville, Md., Raymond J. Dearie, U.S. Atty. for the Eastern Dist. of N.Y., Brooklyn, N.Y. by Vicki G. Golden, Consumer Affairs Section, Antitrust Div., Dept. of Justice, Washington, D.C., for plaintiff.

Howard F. Cerny, John T. McDonald, New York City, for defendants.

## MEMORANDUM–DECISION AND ORDER

BARTELS, Senior District Judge.

This criminal prosecution under the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 331(a), (k), resulted in a verdict by Magistrate Caden that the defendants, Torigian Laboratories, Inc., and Puzant C. Torigian, were guilty of all eighteen counts of the information with which they were charged.

In or about October, 1976, the defendants received intraocular lenses from Copeland Intra Lenses, Inc. for the purposes of sterilization, individual packaging in vials and labeling. After performing the work, the defendants sent the lenses back to Copeland.

It was determined below that three lots of intraocular lenses, which were packaged in sealed containers and marked as "sterile", were in actuality contaminated with

pseudomonas and other micro-organisms. The defendants were found by the Magistrate to be guilty of causing the lenses in these three lots to be adulterated (counts 1 through 3) and misbranded (counts 4 through 6), and of causing the delivery for introduction into interstate commerce of six shipments of intraocular lenses that were adulterated (counts 7 through 12) and misbranded (counts 13 through 18).

The defendants appeal on four grounds: 1) the information should have been dismissed for vagueness; 2) the information should have been dismissed for being multiplicious; 3) the defendant Puzant C. Torigian should not have been held to be personally responsible; and 4) the government did not prove beyond a reasonable doubt that the lenses were adulterated by Torigian Laboratories.

After having carefully examined the briefs as well as the decision of Magistrate Caden, and based upon the oral argument, this court concludes that the Magistrate's decision thoroughly and correctly analyzed the issues raised in this appeal and that it is supported by substantial evidence in the record. Accordingly, this court affirms the Magistrate's decision in all respects and adopts his well considered opinion.

SO ORDERED.

## —APPENDIX—

## MEMORANDUM OF DECISION

CADEN, United States Magistrate.

This is a criminal prosecution under the Federal Food, Drug and Cosmetic Act (the "Act"), 21 U.S.C. § 321 *et seq.* [§ 301 et seq.]. The eighteen count information charges the defendants, Torigian Laboratories, Inc. and Dr. Puzant C. Torigian, with four kinds of criminal violations.[1] They are charged with violating 21 U.S.C. § 331(k) by causing intraocular lenses, "devices" within the meaning of 21 U.S.C. § 321(h), to be processed while being held

---

1. Both sides consented to have the case tried before the Magistrate without a jury. The trial was held on August 9–13, 1982.

for sale after their shipment in interstate commerce, resulting in the lenses being adulterated (counts 1 through 3) and misbranded (counts 4 through 6). They are further charged with violating 21 U.S.C. § 331(a) by causing the delivery for introduction into interstate commerce of intraocular lenses that were adulterated (counts 7 through 12) and misbranded (counts 13 through 18).

All of the counts result from defendants alleged processing and shipping, in or about October, 1976, of three lots of intraocular lenses, numbered 76285, 76289 and 76296, which were packaged in sealed containers marked "sterile" but which were contaminated with pseudomonas and other micro-organisms. Counts 1 through 3 and 7 through 12 charge that the lenses were adulterated within the meaning of 21 U.S.C. § 351(c) because their purity was less than they were represented to possess. Counts 4 through 6 and 13 through 18 charge that the lenses were misbranded within the meaning of 21 U.S.C. § 352(a) and (j) because their labeling was false or misleading and because they were dangerous to health when used in the manner suggested in their labeling.

On the first day of trial, defendants surprised the government and the court with the filing of a motion to dismiss the information upon the affidavit of defendants' counsel, Howard F. Cerny (Tr. I, pp. 1–26).[2] The affidavit contained various allegations and legal arguments. Mr. Cerny argued that: (1) the information contained duplicitous counts which must be stricken; (2) the use of the term "sterile" in the information, unaccompanied by specific reference to a particular contaminant, namely pseudomonas, was so vague as to render the charges unconstitutional; (3) the statements made by Dr. Torigian during Food and Drug Administration ("FDA") inspections of Torigian Laboratories should be suppressed because the defendant was "in custody"; (4) the government was precluded from bringing the criminal action be-

cause the government had previously elected a civil remedy; and (5) defendants were prejudiced due to the unavailability of a potential witness at trial.

In view of the surprise occasioned by the motion, the court reserved decision with respect to grounds (1), (2), (4) and (5) until after the government had put in its evidence, and permission was granted for defense counsel to renew the motion at that time (Tr. I, pp. 1–26). The court ruled that ground (3) would be addressed at an appropriate time during the trial (Tr. I, pp. 20–21).

Grounds (1), (2), (4) and (5) were renewed. Subsequently, defendants, in their Post Trial Memorandum, charged that the information was multiplicious. Whether this constituted a new ground for the motion to dismiss the information or merely a modification of ground (1) above (charging that the information was duplicitous) was not made clear.

### A. Defendants' Motion to Dismiss the Information

Defendants' motion to dismiss the information was formally denied at trial (Tr. IV, pp. 190–192). The denial stands.

### 1. The Information Was Neither Duplicitous Nor Multiplicious

■ "Duplicity" means the charging of more than one offense in a single count. 8 Moore's Federal Practice, § 8.03 (1981).

Counts 1 through 3 allege that defendants *adulterated* three lots, or batches, of lenses while holding the same after their shipment in interstate commerce. Counts 7 through 12, on the other hand, allege that defendants caused 13 specific adulterated lenses to be *delivered* for introduction into interstate commerce. Likewise, counts 4 through 6 charge the *misbranding* of three lots, or batches, of lenses while the same were held for shipment in interstate commerce, while counts 13 through 18

---

**2.** References to the transcript will be by volume: e.g., "Tr. I" refers to the transcript of the trial,

August 9, 1982.

charge that defendants caused the *delivery* of 13 specific misbranded lenses for introduction into interstate commerce.

None of the counts are duplicitous. Defendants apparently mean to argue that the counts were multiplicious.

The counts are not multiplicious. The test for multiplicity was enunciated by the Supreme Court in *Blockburger v. United States*, 284 U.S. [299], 304 [52 S.Ct. 180, 182, 76 L.Ed. 306] (1932), as follows:

> The test to be applied ... is whether each [violation] requires proof of an additional fact which the other does not.

Defendants argue that, because the requirement of interstate commerce is merely jurisdictional, *United States v. Eisenberg*, 596 F.2d 522, 526 (2d Cir.1979), no distinction can be drawn between counts 1 through 3 and 7 through 12, all of which concern adulteration of lenses, and, similarly, no distinction can be drawn between counts 4 through 6 and 13 through 18, all of which concern misbranding of lenses. Defendants are mistaken.

■ For counts 1 through 3, the government was required to prove that defendants *caused lenses to be adulterated while the same were held for sale* after their shipment in interstate commerce. 21 U.S.C. § 331(k). For counts 7 through 12, the government was required to prove that, after the adulteration, defendants took the next step of *delivering 13 adulterated devices* for shipment in interstate commerce. 21 U.S.C. § 331(a). The Act defines two separate actions as distinct violations—first, the adulteration of the device and, second, causing the delivery of the adulterated device for introduction into the channels of interstate commerce. The same distinction exists for the counts alleging misbranding: for counts 4 through 6, the government must prove that defendants *caused the misbranding*, while, for counts 13 through 18, the government must prove that defendants *caused the misbranded lenses to be delivered* for introduction into interstate commerce.

### 2. The Information is Not Unconstitutionally Vague

■ The information charged in all counts that defendants had represented certain lenses, or batches of lenses, to be sterile when they were not sterile (Counts 1–3 and 7–12), or that they had labeled certain lenses, or batches of lenses, as sterile when they were not sterile (Counts 4–6 and 13–18). Testimony at trial established that "sterile" is a word of common usage, meaning the absence of microbial contamination (Tr. II, p. 45; Tr. IV, pp. 30, 108–109). Dr. Torigian himself expressed no confusion when asked about the sterility of the lenses (*See, e.g.*, Tr. V, p. 92, "Q: And you knew that intraocular lenses needed to be sterile didn't you? A: Absolutely"). Documents obtained from the defendants and introduced into evidence demonstrate that, at the time of the occurrences charged in the information, defendants fully understood the meaning of "sterile" and "sterility" (*See, e.g.*, Exhibits 3, 22–25, 30). Furthermore, the Government has assured the court that defendants were offered the opportunity in May 1982, to inspect all documents relating to the case, including the work sheets of the FDA analysts and copies of the FDA inspector's report on Torigian Laboratories, which information reveals the FDA's finding of contamination of pseudomonas (Tr. IV, pp. 191–192; Government's Response to Defendant's Post Trial Memorandum, at 2). Thus, defendants knew or reasonably should have known well ahead of trial that the contamination found on each lense was pseudomonas. I note also that defendants filed no motion for additional discovery.

In any event, the gravamen of the offenses charged is not that the lenses were contaminated with pseudomonas, but that the lenses were not sterile when so represented and labeled. That the contaminating organism was pseudomonas was merely evidence. There is no requirement that an information plead evidence. *Van [Liew] v. United States*, 321 F.2d 664, 670 (5th Cir.1963).

The information fairly apprised defendants of the nature of the accusations against them: it specified lot numbers, lens numbers, date, and the representation or labeling that was false or misleading. The facts were "set forth with reasonable particularity of time, place and circumstances." *United States v. Cruikshank*, 92 U.S. 542, 558 [23 L.Ed. 588] (1875); *Russell v. United States*, 369 U.S. 749, 765 [82 S.Ct. 1038, 1048, 8 L.Ed.2d 240] (1962).

3. *Testimony Concerning Statements Made By Dr. Torigian Was Properly Admitted*

■ Defendants objected to the admission of testimony by Mr. Stewart Mueller concerning statements made by Dr. Torigian during the course of the FDA inspection based on the failure to give Dr. Torigian his *Miranda* warnings. Based on the evidence presented at trial, the court ruled that defendants were not in the custody of the FDA at any time, citing *Miranda v. Arizona*, 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (1966) (Tr. III, p. 60). The court additionally ruled that the inspections were proper, regulatory inspections done under statutory authority, that no criminal search warrant was required, and that the records provided by defendants were given voluntarily (Tr. II, p. 84). *See also United States v. Jamieson-McKames Pharmaceuticals, Inc.*, 651 F.2d 532, 536–40 (8th Cir. 1981), *cert. denied*, 455 U.S. 1016, 102 S.Ct. 1709 [72 L.Ed.2d 133] (1982); *United States v. New England Grocers Supply Co.*, 488 F.Supp. 230, 237–39 (D.Mass.1980).

4. *The Government's Pursuit Of A Civil Remedy Did Not Foreclose Criminal Prosecution*

■ Defendants argue that it was unconscionable for the government to prosecute defendants some years after obtaining injunctive relief based upon the same misconduct. Defendants cite no authority for this proposition. The Act specifically provides for both civil penalties, such as injunctions (21 U.S.C. § 332) and seizures (21 U.S.C. § 334), and criminal penalties (21 U.S.C. § 333). The government may use one, two or all three types of relief; it need not choose among them. *See United States v. Kordel*, 397 U.S. 1, 11 [90 S.Ct. 763, 769, 25 L.Ed.2d 1] (1970).

5. *Defendants Have Failed To Demonstrate Actual Prejudice By The Delay In The Criminal Action*

■ Defendants argue that the government is estopped from bringing a criminal proceeding because at the time of trial a potential witness, Ms. Jay Shree Lala, was unavailable to testify.

The decisions by the Supreme Court in *United States v. Lovasco*, 431 U.S. 783 [97 S.Ct. 2044, 52 L.Ed.2d 752] (1977), and *United States v. Marion*, 404 U.S. 307 [92 S.Ct. 455, 30 L.Ed.2d 468] (1971), are dispositive on the issue of whether pre-indictment delay warrants dismissal of an indictment. The Court in *Lovasco* emphasized that the defendants' primary protection against pre-indictment delay is statutory rather than constitutional in nature:

... [S]tatutes of limitation, which provide predictable, legislatively enacted limits on prosecutorial delay, provide "the primary guarantee against bringing overly stale criminal charges."

431 U.S. at 789 [97 S.Ct. at 2048] (*quoting United States v. Marion*, 404 U.S. at 322 [92 S.Ct. at 464] and *United States v. Ewell*, 383 U.S. 116, 122 [86 S.Ct. 773, 777, 15 L.Ed.2d 627] (1966)). The defendants concede that the instant case is not barred by the statute of limitations.

Accordingly, when a case is brought within that statutory period, the Fifth Amendment's Due Process Clause has only "a limited role to play." *United States v. Lovasco*, 431 U.S. at 789 [97 S.Ct. at 2048]. To invoke that role, the Court mandated a showing *by the defendant* that the delay resulted in "actual prejudice." *United States v. Lovasco*, 431 U.S. at 789 [97 S.Ct. at 2048].

Defendants alleged prejudice in that Ms. Lala could have testified about the "care and methods actually used in preparing the alleged defective lots" (Cerny Affidavit at 10). Defendants' mere assertions that they cannot find Ms. Lala and that her testimo-

ny would be useful is too speculative to warrant relief. First, defendants admitted they made no efforts to find her (Tr. V, pp. 104–105). Second, it is doubtful whether Ms. Lala could testify to anything of substance in addition to the testimony of Mr. Navin Dave and Dr. Torigian. Mr. Dave and Dr. Torigian met with the FDA investigator Stewart Mueller and described the operations at Torigian Laboratories in detail (Tr. V, pp. 87–137, 160). Mr. Dave was the supervisor of the sterilization processing. He signed off on all the batch-processing documents, sterilization procedures, and test procedures put into evidence at trial (Exhs. 22–29, 35). He was thus personally involved with the operation, and he presented himself to Mr. Mueller and to this court as the person most knowledgeable about the processing operation (Tr. V, pp. 4–24).

Moreover, to the extent that Ms. Lala would testify as to the care and methods used in the processing, such testimony would not shield defendants from liability in this case if it was proved that the lenses were not sterile after they were processed and packaged by the defendants. Thus, defendants have shown no actual prejudice from the failure of Ms. Lala to testify at the trial.

## B. *Findings*

### 1. *Intraocular Lenses Are Devices Within The Meaning Of 21 U.S.C. § 321(h)(3)*

■ An intraocular lens is an instrument that is implanted in the human eye to affect its structure and function by replacing the eye's natural lens. It does not work chemically and it is not metabolized (Tr. I, p. 34; Tr. II, p. 45). Rather, it remains intact and performs its task optically (Tr. II, pp. 44–45). It is, therefore, a "device" within the meaning of 21 U.S.C. § 321(h)(3).

The FDA regards intraocular lenses as medical devices, 41 Fed.Reg. 38802 (September 13, 1976) and regulates their use as such, 21 CFR § 813.

### 2. *The Lenses Involved In Counts 1 through 6 Were Held For Sale By Defendants After Their Shipment In Interstate Commerce*

■ 21 U.S.C. § 331(k) prohibits the doing of any act with respect to a device "while such article is held for sale (whether or not the first sale) after shipment in interstate commerce" which act "results in such article being adulterated or misbranded."

With respect to devices, the Act presumes that the requirement of shipment in interstate commerce has been satisfied. 21 U.S.C. § 379. Thus, the government was not required to prove that the devices, intraocular lenses, were shipped in interstate commerce in order to invoke the jurisdiction of this court.[3] Nevertheless, uncontroverted evidence at trial established that lucite lens blanks which eventually became the lenses in Torigian lot numbers 76285, 76289 and 76296, were shipped by Glasflex, Inc. of Sterling, New Jersey, to Copeland Intra Lenses, Inc. ("Copeland"), in New York (Manhattan), where they were made into intraocular lenses and then were sent on to Torigian Laboratories, in Queens Village, New York, to be sterilized, individually packed in vials and labeled (Tr. I, pp. 36–39, 56–57, 60–61; Exhs. 4 and 5).

All articles held for purposes other than personal consumption—whether to be sold or given away—are deemed to be held for sale under the Act. *Hipolite Egg Co. v. United States*, 220 U.S. 45, 54 [31 S.Ct. 364, 366, 55 L.Ed. 364] (1911); *United States v. Cassaro, Inc.*, 443 F.2d [153], 154, 155 (1st Cir.1971); *United States v. Kocmond*, 200 F.2d 370 (7th Cir.1952), *cert. denied*, 345 U.S. 924 [73 S.Ct. 782, 97 L.Ed. 1355] (1953); *United States v. Animal Drug Containing [Diethylstilbestrol]*, 528 F.Supp. 202, 205 (D.Neb.1981). All of the lenses at issue in this case were held at defendants' laboratory for purposes other than their personal consumption. Mr. Michael Copeland, president of Copeland In-

---

**3.** Defendants' motion to dismiss counts 1 through 6 on the ground that only a component part of the device was shipped in interstate

commerce was denied at trial (Tr. IV, pp. 175–190).

tra Lenses, (Tr. I, pp. 32–33) testified that his firm sent the lenses comprising lots 76285, 76289 and 76296 to Torigian Laboratories for sterilizing (Tr. I, pp. 37, 60–61, 65), that Torigian Laboratories processed the lenses, packed them into containers, and applied labeling (Tr. I, p. 38), and that Torigian Laboratories returned the lenses to Copeland (Tr. I, pp. 60–65). Dr. Puzant Torigian, president of Torigian Laboratories, admitted that Torigian Laboratories received, processed, and returned to Copeland Intra Lenses the three lots of issue here (Tr. V, pp. 86–92).

3. *The Lenses Involved In Counts 7 Through 18 Were Delivered For Introduction Into Interstate Commerce*

21 U.S.C. § 331(a) prohibits "the introduction or delivery for introduction into interstate commerce" of any device that is adulterated or misbranded. Again, with respect to devices, the Act presumes that the jurisdictional requirement of interstate commerce is satisfied. 21 U.S.C. § 379a. In addition, the government has established beyond a reasonable doubt, by direct testimony and documentary evidence, that defendants caused the lenses involved in the adulteration and misbranding charges in counts 7 through 18 to be delivered for introduction into interstate commerce. Mr. Copeland testified that Copeland Intra Lenses received each of the lenses in counts 7 through 18 from Torigian Laboratories (Tr. I, pp. 36–37, 48–49), and sent them to consignees outside of New York State (Tr. I, pp. 66–82; Exhs. 10–17).

4. *The Lenses Processed By Defendants Were Not Sterile*

Torigian Laboratories assigned lot numbers to each batch of lenses sent to it by Copeland Intra Lenses. After treating the lenses to sterilize them, Torigian Laboratories packed the lenses in individual vials and stenciled the lot number on each vial (Tr. I, p. 40). In addition, Torigian Laboratories stenciled a label on each individual vial. The label read in part:

ONE INTRAOCULAR LENS
Sterile In Sodium Bicarbonate 0.5% Solution
COPELAND INTRA LENSES, INC.

(Exhs. 19–21, 31–34). Each vial was packed in a styrofoam container, also marked "sterile" (Exhs. 19–21, 31–34). Prior to shipment to consumers, the cap of each vial was marked by Copeland with a lens number (Tr. I, p. 49).

"Sterile" means the complete absence of viable organisms. Dr. Brooks Poley, an opthamologist and eye surgeon (Tr. II, p. 41), stated: "Sterile means that whatever is sterile can have no bacteria and no fungus growth on it or attached to it." (Tr. II, p. 45). Michael Palmieri, an FDA microbiologist (Tr. IV, p. 3), testified that sterility is the total absence of living organisms from an article (Tr. IV, p. 30). Dr. Frank Engley, Jr., an established expert in the field of microbiology with special expertise in sterility (Tr. IV, pp. 103–107), testified that sterile means a "complete absence of viable microorganisms" (Tr. IC, pp. 108–109).

A tragic incident involving Dr. Poley first called attention to the fact that the lenses in Torigian lot numbers 76285, 76289 and 76296, at issue here, were not sterile.

Dr. Poley testified that on Wednesday and Thursday, November 10 and 11, 1976, he and two other doctors implanted intraocular lenses from a Copeland shipment of lenses from lot number 76285 in the eyes of eight patients at Abbott Northwestern Hospital in Minneapolis, Minnesota. On Friday Dr. Poley noted infection or inflammation in the eyes of every one of the eight patients (Tr. II, pp. 46–48). Dr. Poley took samples from two of the eyes in which he noted infections, and had them analyzed in the hospital laboratory, along with samples of packing fluid from the vials of unused Copeland lenses received in the same shipment. The laboratory analysis revealed pseudomonas growth from all the samples from the patients' eyes as well as from each of the packing fluid samples from the unused lenses. Based in part on these findings, Dr. Poley diagnosed his patients' eye conditions as pseudomonas infections

originating from contaminated intraocular lenses (Tr. II, pp. 48–53).

Subsequently, 13 lenses in sealed vials from lots 76285, 76289 and 76296 processed by Torigian Laboratories were collected and tested by the FDA and were found to be contaminated. These 13 lenses are the subject of the instant prosecution. Appendix 1 to this memorandum presents a chart detailing the collection and analysis of the 13 lenses by the FDA and the relationship of those lenses to the respective counts of the indictment. Counts 1 through 3 and 4 through 6 concern entire lots, rather than individual lenses, and a separate breakdown of the FDA collection and analysis as it relates to these counts is provided in Appendix 2 to this memorandum.

The evidence at trial showed that the pseudomonas and other microorganisms found by the FDA analysts existed in the sealed lens vials returned to Copeland Intra Lenses by defendant Torigian Laboratories.

Prior to the start of each analysis by the FDA, every single vial was intact: The rubber stopper was firmly in place and the metal seal bearing the lens number inscribed by Copeland was in place over the stopper and top of the vial and had not been tampered with. Thus, it was clear that none of the vials had been opened or tampered with prior to the analysis (Tr. II, pp. 166, 225; Tr. IV, p. 20).

Furthermore, a "presumption of regularity supports the official acts of public officers, and in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Chemical Foundation*, 272 U.S. 1, 14–15 [47 S.Ct. 1, 6–7, 71 L.Ed. 131] (1926); *Pasadena Research Labs. v. United States*, 169 F.2d 375, 381 (9th Cir.), *cert. denied*, 335 U.S. 853 [69 S.Ct. 83, 93 L.Ed. 401] (1948). In this case,

the presumption of official regularity applies to the handling of the vials by the FDA employees who collected the vials from Copeland, from Abbott Hospital, and from Dr. Goumas, the care and methods used by the analysts, and the absence of tampering on the part of postal employees through whose hands shipments passed. Defendants introduced no evidence of tampering, of bad faith, or of evil motivation to rebut the showing of the government's precautions to maintain the evidence in its original state. *United States v. Lane*, 591 F.2d [961] (D.C.Cir.1979). There is also a presumption that the doctors, nurses, and other hospital personnel who may have handled the vials performed their functions in a regular manner. *Pasadena Research, supra*, 169 F.2d at 382; *United States Bank v. Dandridge*, 25 U.S. [64], 69–70 [12 Wheat 64, 69–70, 6 L.Ed. 552] (1827). No evidence was presented by defendants to rebut that presumption.[4]

Each of the FDA sterility analyses was done by a trained and experienced professional. Mr. Oxborrow is a trained microbiologist who has done over ten thousand sterility analyses (Tr. II, pp. 162–164). Mr. Oji is a trained microbiologist who has done over one thousand sterility analyses (Tr. II, pp. 221–222). Mr. Palmieri is a trained microbiologist who has done several hundred sterility analyses (Tr. IV, pp. 3–4). Each of the analyses was performed using aseptic techniques designed to eliminate all possibility that contamination of the lenses could occur in the laboratory (Tr. II, pp. 166–170, 225–229; Tr. IV, pp. 7–10). Further, an extensive system of controls was utilized throughout each of the analyses. Plates of growth media were exposed to the air in the work area throughout each of the analyses, and media equipment were all tested. These controls were incubated with no growth observed, proving the test environments sterile (Tr. II, pp. 172, 229–230; Tr. IV, pp. 10, 21). The microbial

---

4. In any event, "there is no hard and fast rule that the prosecution must exclude all possibility that the article may have been tampered with" *United States v. S.B. Penick & Co.*, 136 F.2d 413, 415 (2d Cir.1943); *United States v. Stevenson*, 445 F.2d 25, 27 (7th Cir.) *cert. denied*, [404] U.S. 857 [92 S.Ct. 108, 30 L.Ed.2d 99] (1971). If the government were required to establish the negative, the absence of tampering by every single person who may have had contact with lenses, the Act could not be enforced. *Pasadena Research Laboratories v. United States*, 169 F.2d 375 (9th Cir.), *cert. denied*, 335 U.S. 853 [69 S.Ct. 83, 93 L.Ed. 401] (1948).

growth found from each of the vials and lenses was then subjected to a procedure knows as "speciation," which involves inoculation of growth into a battery of biochemicals to identify the specific contaminant. From every single vial and lens tested by the FDA, pseudomonas bacteria were identified (Tr. II, p. 177; Tr. III, p. 7; Tr. IV, pp. 15–16).

Each of the FDA microbiologists analyzing the samples concluded that the microbial growth he detected came from within the vials containing the lenses and could not have come from the laboratory environment (Tr. II, pp. 178, 234; Tr. IV, pp. 16–17). They all agreed that the type of organism they detected, pseudomonas, is not a laboratory contaminant (Tr. II, pp. 177–178, 234; Tr. IV, p. 16).

Dr. Engley testified that the procedures employed by the FDA microbiologists were good standard procedures for sterility analysis. These laboratory techniques allowed "absolutely no possibility" of pseudomonas organism entering into the system as a contaminant (Tr. IV, p. 109). Dr. Engley testified specifically that pseudomonas could not have come from handling. "It's not an airborn contaminant, it's not a surface contaminant. It lives and survives in water, in warm, moist places" (Tr. IV, p. 110).

In addition, Dr. Engley testified that the consistency of the findings of pseudomonas contamination confirmed that the contamination came from the same source, Torigian Laboratories. Three different FDA laboratories in three different parts of the country analyzed the lenses. Each laboratory isolated the same type organism, pseudomonas, from the lenses. Moreover, patients at Abbott Hospital who had lenses from the same lot implanted all developed infections from the same organism—pseudomonas. Dr. Engley opined that it was "impossible" that the pseudomonas organisms could have been introduced into the samples after they were sealed by the defendants. He explained: "It might occur like one container, it might have had a crack in it or the seal wasn't proper, but not all of those with the same type organisms." (Tr. IV, p. 125). The "very highly

consistent results from the vials, from the lenses, from the patients who received the lenses" led Dr. Engley to conclude that the contamination could only have come from the defendants (Tr. IV, p. 112).

Based upon the evidence just summarized, I find that the government has proved beyond a reasonable doubt that the sealed vials containing the 13 lenses at issue in this case were not sterile but were contaminated with pseudomonas and that this contamination was introduced by defendants in their processing of the lenses.

5. *The Lenses Involved In Counts 1 through 3 and 7 through 12 were adulterated*

In nine counts of the information, defendants are charged with violations with respect to adulteration of devices. Under the Act, 21 U.S.C. § 351,

A ... device shall be deemed to be adulterated

(c) If ... its strength differs from, or its purity or quality falls below, that which it purports or is represented to possess.

■ Proof of adulteration under this section of the Act involves two elements: (1) a representation that the device meets a given quality and (2) failure of the device to meet that quality. The representation may be made in any manner, including written expressions, inherent meaning, and the labeling of the device itself. *Dean Rubber Mfg. Co. v. United States*, [356] F.2d 161, 163 (8th Cir.1966); *United States v. Morton-Norwich Products, Inc.*, 461 F.Supp. 760 (N.D.N.Y.1978).

■ At trial, the government proved by uncontroverted evidence that the devices were represented as sterile and purported to be sterile. The evidence showed that defendants processed the devices under a contract with Copeland that required defendants to sterilize the devices (Tr. I, pp. 37–38, 48). Dr. Torigian testified that the lenses "wouldn't have been sent out if they had not been sterilized" (Tr. V, p. 87). In addition, written communications gave Copeland added assurances that the devices

processed by defendants were sterile. On June 14, 1976, Dr. Torigian wrote to Copeland, "Please be assured of our diligence in maintaining our product at its ophthalmol quality" (Exh. 2). On June 17, 1976, Dr. Torigian again wrote to Copeland representing that lenses processed by defendants were sterile (Exh. 3). Finally, the devices were themselves labeled as "sterile" (Exhs. 19–21, 31–34).

As discussed above, the evidence in this case conclusively establishes that the devices were not sterile. The devices were thus adulterated as a matter of law. *United States v. Morton-Norwich Products, Inc., supra.*

6. *The Lenses Involved in Counts 4 through 6 and 13 through 18 Were Misbranded*

Nine counts of the information charge defendants with misbranding violations. Under the Act, 21 U.S.C. § 352,

A drug or device shall be deemed to be misbranded—

(a) If its labeling is false or misleading in any particular.

\* \* \* \* \* \*

(j) If it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof.

It is only necessary that the evidence establish that the devices are misbranded in any one of the ways alleged, not every way. *United States v. Guardian Chemical Corp.*, 410 F.2d [157], 162 (2d Cir.1969). The government has nevertheless proved that the lenses were misbranded under both sections alleged.

■ Misbranding under 21 U.S.C. § 352(a) requires proof of two elements: (1) a representation in the labeling of the device; and (2) the false or misleading nature of that representation. The proof in this case is simple and straightforward. Each of the lenses at issue in this case contained the word "sterile" in its labeling (Exh. 19–21, 31–34). That representation was false and misleading because the devices were not, in fact, sterile.

■ Misbranding under 21 U.S.C. § 352(j) also involves two elements: (1) a manner of use suggested in the labeling; and (2) a danger to health from the suggested manner of use. The evidence at trial showed that the devices were identified as "intraocular lenses" in their labeling (Exhs. 19–21, 31–34; Tr. V. p. 91). As the testimony at trial showed, intraocular lenses are devices designed for surgical implantation in the human eye (Tr. I, p. 34; Tr. II, p. 48: Tr. V, p. 92). Thus, the labeling, "intraocular lens," suggested its use for surgery.

■ When an article is represented to be sterile and is clearly intended for surgical use, it is obviously a menace to the public health if not actually sterile. *United States v. 48 Dozen Packages ... Gauze Bandage*, 94 F.2d 641 (2d Cir.1938). Further, Dr. Poley testified that surgical implantation into the human eye of an intraocular lens that is not sterile can lead to grievous injuries. "It would threaten the vision, cause an infection, and the loss of an eye, potentially. It's just a catastrophic event, if that happens" (Tr. II, p. 46). Dr. Poley's statement is confirmed by the fact that his patients at the Abbott Hospital uniformly developed serious infections after having contaminated lenses from Torigian Laboratories lot number 78285 surgically implanted in their eyes.

Thus, the evidence proves beyond a reasonable doubt that the lenses were misbranded within the meaning of 21 U.S.C. § 352(j) in that the labeling suggested that they were to be used for surgical implantation in the eye, they were not sterile and, when implanted in the eye, they were dangerous to health in that they tended to cause infection.

7. *Torigian Laboratories, Inc., is Criminally Liable For the Adulteration and Misbranding*

■ The Act provides that criminal penalties attach to any person who causes a violation under 21 U.S.C. § 331 and the term "person" is defined as an "individual, partnership, corporation, and association,"

21 U.S.C. § 321(e). In food and drug cases, criminal liability attaches without any proof of intent, knowledge, or awareness of wrongdoing. *United States v. Park*, 421 U.S. 658 [95 S.Ct. 1903, 44 L.Ed.2d 489] (1975).

 With respect to counts 1 through 6 the government needed to show only that the corporate defendant, Torigian Laboratories, Inc., undertook some act with respect to the lenses that were held for sale after shipment in interstate commerce, which act resulted in the lenses being adulterated and misbranded. 21 U.S.C. § 331(k). With respect to counts 7 through 18, the government needed to show only that the corporate defendant caused the delivery for introduction into interstate commerce of the adulterated and misbranded lenses. 21 U.S.C. § 331(a).

The evidence presented at trial demonstrates beyond a reasonable doubt that Torigian Laboratories received the lenses comprising lots 76285, 76289 and 76296 from Copeland and processed those lenses. The lenses were put through a sterilization process, put in vials, sealed, labeled as sterile, and returned to Copeland for delivery to its customers outside New York State. Dr. Puzant Torigian has admitted that the corporation performed all of these steps (Tr. V, pp. 86–87). The evidence further demonstrates that when the lenses were returned by the defendant to Copeland, they were not sterile but were contaminated. This is all the court need find to hold the corporation guilty on all 18 counts.

In this case, however, the evidence shows more; it clearly demonstrates that Torigian Laboratories' procedures were irresponsible and careless, that the procedures used in the sterilization process did not follow the Good Manufacturing Practices ("GMP's") of the industry, did not follow procedures set out by the United States Pharmacopoeia ("USP") and did not even follow Torigian Laboratories' own written procedures.

### 8. *Torigian Laboratories Failed to Exercise Due Care in Processing the Lenses*

 Stewart Mueller, the FDA investigator assigned to inspect Torigian Laboratories in connection with this incident, testified that he examined the batch reports and records of sterility testing for batches (lots) 76285, 76289 and 76296 and found deficiencies in the procedures utilized (Tr. III, pp. 120–136; (Exhs. 26–30, 35). Specifically, Mr. Mueller testified that the operator at Torigian Laboratories had not separately endorsed each step of the sterilization process or any of the three batch records (Tr. III, pp. 220–221; Exhs. 26–28). Mr. Mueller explained that GMP's require that weights and measures be separately indicated by the person performing the operation in order to show that the instructions set out in the master instruction sheets are followed (Tr. III, p. 223). The batch processing records provide space for endorsement of each step of the process, but these were not used by Torigian Laboratories in carrying out the sterilization procedures (Tr. III, p. 225).

In addition, Torigian Laboratories' testing procedure to show whether the processed lenses were actually free of contamination was inadequate. Under defendants' sterility testing procedure (Exh. 30), eight glass beads were processed with each sub-batch of lenses. The eight glass beads were run through the entire process with the sub-batch until the last two steps. Four glass beads were placed into vials containing bicarbonate solution, and the remaining four beads were placed directly into growth media. The four beads placed in the vials were subsequently removed and also placed into growth media. The media containing the eight beads was then incubated for seven days (Tr. III, pp. 113–115).

This sterilization testing procedure, designed by the defendants (Tr. I, pp. 156, 158, 177; Tr. V, p. 31), contained several glaring deficiencies. First was the failure to test the product itself. Instead of the actual lenses, or cheaper dummy lenses,

the process tested glass beads. Torigian Laboratories had no data that indicated that their substitution of glass beads for actual lenses yielded the same results (Tr. III, pp. 115–116). Glass beads are hard and spherical rather than soft and irregular in shape as are actual lenses. As Dr. Engley stated: "The use of the glass beads to simulate the plastic lens is not, I would say, not exact enough because a glass bead is a lot different than a 9 millimeter acrylic plastic. The surface is much harder, and the material such as organisms wouldn't adhere as well" (Tr. IV, p. 116). Defendants' suggestion that the use of glass beads in the place of plastic lenses was an effort to reduce cost is especially disturbing (Tr. III, p. 111).

Second, even if glass beads were suitable substitutes for plastic lenses in sterility testing, the number of beads used in defendants' process was inadequate. Only eight beads were used with each sub-batch. Dr. Engley testified that the USP recommends that at least 20 samples of the product be tested (Tr. IV, pp. 116–117). Additionally, defendants failed to test glass beads in the closure systems at the end of the last sub-batch of the day. This meant that the bicarbonate solution, filter, and closure system was not tested for that sub-batch (Tr. III, pp. 116–117).

Third, the incubation period for the sterility test was inadequate. Standard sterility testing procedures set out in the USP require that growth media exposed to test samples be incubated for 14 days (Tr. IV, pp. 22, 117; Tr. II, pp. 173, 230). Even Mr. Navin Dave, Director of Quality Control for Torigian Laboratories, admitted that USP requires that sterility testing incubation be continued for 14 days (Tr. V, p. 31). Torigian Laboratories incubated the growth medium for only seven days. The shortened incubation period is especially significant where, as here, sterilization is performed by exposing organisms to toxic chemicals such as sodium hydroxide. If the chemical is not strong enough, it is possible that microorganisms will be injured but not killed by the process. The company's records do not evidence any tests on the potency of the sodium hydrox-

ide (Tr. IV, pp. 113–14). Injured microorganisms might take longer than seven days to recover and grow after being exposed to the growth media.

In addition, Torigian Laboratories used potassium sorbate, as a preservative, in their final packing solution. This preservative could have retarded but not entirely halted the growth of the microorganisms (Tr. IV, pp. 117–119). Thus, Torigian Laboratories' seven-day incubation period was not sufficient to detect contamination in the process.

On June 15, 1976, Dr. Torigian personally wrote to Copeland suggesting the addition of potassium sorbate as "a bacteriostatis/fungistatic/yeast inhibitor" to the solution in the vials containing intraocular lenses. (Exh. 2). He indicated that the corporation would do considerable microbiological testing prior to adding this new ingredient to the solution. Mr. Copeland testified that he never approved the addition of potassium sorbate to his product nor was he aware that it was ever added (Tr. I, p. 54). However, on August 10, 1976, Torigian Laboratories instituted a new procedure for sterilizing the Copeland lenses (Exh. 23). The most significant difference between the August 1976 procedure, which was endorsed by Dr. Torigian (Tr. V, p. 79), and the procedure previously in use (Exh. 22), was the addition of potassium sorbate to the packing solution (Tr. III, p. 104; compare Exh. 22, ¶ 5 with Exh. 23 ¶ 9). At the November 1976 inspection, Dr. Torigian told Mr. Mueller that he personally had decided on the addition of potassium sorbate to include some bacterial preservative in the solution (Tr. III, p. 105). Yet, he had conducted no scientific tests to determine the safety and efficiency of potassium sorbate as an ingredient in the packing solution of intraocular lenses; rather, he had relied on chemistry manuals (Tr. III, p. 108). Dr. Torigian testified that he had only cursory contact with Mr. Mueller during the latter's investigation (Tr. 72–75). The court does not credit Dr. Torigian on this subject; but rather believes Mr. Mueller's testimony without qualification.

It should also be noted that the use of preservative such as potassium sorbate in the final lens packing solution is an admission by Torigian Laboratories that it did not have full confidence in its sterilization process. If the sterilization process is effective, no preservative is needed because an intraocular lens is a one-use item, it is not opened and resealed (Tr. IV, p. 118).

Finally, Torigian Laboratories did not even follow its own procedures in testing the sterility of the lenses. Exhibit 28, the record of sterility testing for batch 76285, indicates that only six beads were tested for each sub-batch, rather than the eight set out in the company's written procedure. Further, as Mr. Mueller noted, the record did not indicate for each of the beads tested what the results were (Tr. III, pp. 128–29). A similar deficiency is found in Exhibit 29, the record of sterility testing of batch 76296.

### 9. *Torigian Laboratories' Processing Of The Lenses In This Case Demonstrated Gross Negligence*

█ The record of Torigian Laboratories' handling of batches 76285 and 76296 demonstrates an egregious failure to remedy an obvious defect in the sterilizing procedure. These two batches were repeatedly subject to problems suggesting contamination; but, no bacteriological testing was done.

Batches 76285 and 76296 were processed on successive days, October 5 and 6, 1976 (Exhs. 26 and 27; Tr. V, p. 36). Exhibit 26, the record for batch 76285, indicates that 71 of the 225 lenses processed were rejected; Exhibit 27, the record for batch 76296, indicates that 56 of the 211 lenses processed were rejected. Mr. Dave testified that normally only one or two lenses in a batch were rejected (Tr. V, pp. 35–36). Yet, nowhere on the batch processing records or anywhere else is there any documentation of the reason for a rejection rate fifty times normal (Tr. III, p. 212; Tr. V, p. 51). GMP requires that when a process breaks down there must be records documenting the reason for the failure (Tr. III, p. 218).

Not only were no records kept, but Mr. Dave admitted that no tests were performed on the rejected lenses, only a visual inspection (Tr. V, pp. 35, 37). Further, in November 1976, barely six weeks after these two batches had been processed, neither Mr. Dave nor Dr. Torigian was able to tell the FDA investigator, Mr. Mueller, precisely why so many lenses had been rejected from batches 76285 and 76296 (Tr. III, pp. 124–125, 214–215). Yet, at trial, without any records or test results, Mr. Dave was able to recall that testing was unnecessary because the rejects were caused by particulate matter and fibers in the vials (Tr. V, p. 13). The court rejects Mr. Dave's trial testimony on this point.

The 127 rejected lenses in their vials, sealed, stoppered, and labeled with batch numbers 76285 and 76296, were not destroyed, but were kept aside for reprocessing at some later date. There is no record as to when, if ever, those 127 vials of lenses were reprocessed (Tr. V, pp. 37–38).

Despite the inordinate numbers of rejects, defendants sent the remaining vials in lots 76285 and 76296 to Copeland without doing bacteriological testing. Shortly thereafter, these same batches of lenses were returned by Copeland to Torigian Laboratories because the solutions in the vials had turned cloudy (Tr. V, p. 14; Tr. I, p. 62). Incredibly, defendants still did no bacteriological testing (Tr. V, pp. 15, 39, 94). In fact, a legend typed on the records for both batches in which cloudiness had been observed indicated that the lenses were being reprocessed "so as to eliminate the necessity for extensive evaluation" (Exhs. 26, p. 2 and 27, p. 2). This failure to perform bacterial evaluation was a clear departure from good manufacturing procedures. As Dr. Engley testified,

"The first you think of, the first thing people would think of in sterility, in the sterilization process is if something turns cloudy, that there's microbial growth. And particularly if it wasn't seen at the beginning and it was seen some days or short weeks later. This would suggest

that there may have been very few organisms in there to begin with."
(Tr. IV, p. 121).

It is a GMP requirement to assign a new number to any product that is reprocessed to assure that there can be no possibility of mixup between reprocessed containers and any unreprocessed containers which may exist (Tr. III, pp. 126–127). However, when the remaining vials of batches 76285 and 76296, which had turned cloudy, were reprocessed, Torigian Laboratories assigned them the same batch number they had before (Tr. V, p. 16; Tr. III, pp. 125, 131). This was the same as the batch numbers on the 127 vials that had been rejected but had never been tested to determine the cause of the rejection. Those 127 rejected vials were kept aside in an unknown location for an unknown period of time. Under the circumstances, it is possible that a mixup did occur, that untested, rejected lenses were sent out instead of reprocessed lenses. Mr. Mueller testified that he discussed the returned cloudy vials with Dr. Torigian (Tr. III, p. 125) but Dr. Torigian denied ever having such a conversation (Tr. 74–75). The court credits Mr. Mueller's testimony on this point.

Torigian Laboratories' records were inadequate to show, as required by GMP, that every step of the sterilization process was performed properly. The sterility testing procedure was inadequate to ensure that the lenses processed by Torigian Laboratories, labeled and represented to be sterile, were in fact sterile.

10. *Dr. Puzant Torigian Is Criminally Liable For the Adulteration And Misbranding*

▪ Under the Act, any person who exercises responsibility in the conduct of a business is personally responsible for any criminal acts arising out of that business, whether or not the individual intended to violate the law or even knew of the violative acts. All that need be shown is that the individual was in a position of power or authority to detect, prevent, or correct violations of the Act. *United States v. Park, supra; United States v. Dotterweich,* 320 U.S. 277, 284–85 [64 S.Ct. 134, 138–39, 88

L.Ed. 48] (1943); *United States v. Cassaro, Inc., supra* at 157; *Palmer v. United States,* 340 F.2d 48, 49 (5th Cir.1964), *cert. denied,* 382 U.S. 903 [86 S.Ct. 238, 15 L.Ed.2d 156] (1965); *Lelles v. United States,* 241 F.2d 21, 23 (9th Cir.), *cert. denied,* 353 U.S. 974 [77 S.Ct. 1059, 1 L.Ed.2d 1136] (1957).

As the Court held in *Park,* the Act "dispenses with the need to prove 'consciousness of wrongdoing' ..." *Park,* 421 U.S. at 669 [95 S.Ct. at 1910].

[I]n providing sanctions which reach and touch the individuals who execute the corporate mission ... the Act imposes not only a positive duty to seek out and remedy violations when they occur but also, and primarily, a duty to implement measures that will insure that violations will not occur.

[T]he Government establishes a prima facie case when it introduces evidence sufficient to warrant a finding by the trier of the facts that the defendant had, by reason of his position in the corporation, responsibility and authority either to prevent in the first instance, or promptly to correct, the violations complained of, and that he failed to do so. The failure thus to fulfill the duty imposed by the interaction of the corporate agent's authority and the statute furnishes a sufficient causal link. The considerations which prompted the imposition of this duty, and the scope of the duty, provide the measure of culpability.

*Park,* 421 U.S. at 672–74 [95 S.Ct. at 1911–13].

▪ The evidence presented at trial demonstrates beyond a reasonable doubt that Puzant Torigian was in a position of authority in the corporation to implement adequate procedures to insure that violations of the Act did not occur, but that he did not do so, and that he failed to take adequate measures to determine the cause of and to eliminate an obvious problem when it did occur.

Defendants' Post Trial Memorandum, at 14–16, argues against the imposition of criminal liability in the case of Dr. Torigian on the ground that he lacked the technical

expertise to be able to ascertain and correct any "impropriety" in the processing system. "Torigian is not a chemist or a microbiologist. It was impossible for him to review or interfere in the process." Defendants' Post Trial Memorandum at 16.

It is true, as defense counsel argues that "[t]he theory upon which responsible corporate agents are held criminally accountable for 'causing' violations of the Act permits a claim that a defendant was 'powerless' to prevent or correct the violation..." *Park,* *supra,* 421 U.S. at 673 [95 S.Ct. at 1912] (*citing United States v. Wiesenfeld Warehouse Co.,* 376 U.S. 86, 91 [84 S.Ct. 559, 11 L.Ed.2d 536] (1964). However, Dr. Torigian was not "powerless" to prevent the violations charged, either from an authoritative or a technical standpoint.

Dr. Torigian was president and owner of a controlling interest of the corporation in 1976 when these violations occurred (Tr. V, pp. 66–68). The corporation had only 40–45 employees and operated out of a small brick building with only a half dozen or so operation laboratories (Tr. V, pp. 70–71). Mr. Mueller testified that at the time of the inspection in November 1976, Dr. Torigian admitted that he was the individual in the company who had overall and ultimate responsibility for all of its operations, including deciding what products should be manufactured or processed, methods of processing, methods of testing, and equipment to be used (Tr. III, p. 39). Dr. Torigian confirmed that he was the senior official of the company to whom all employees ultimately reported (Tr. V, pp. 76–77), and had authority if there was a problem in the plant, to shut down production (Tr. V, p. 78).

The evidence at trial demonstrated conclusively that Dr. Torigian was not only in a position of authority and responsibility to detect and prevent violations, but he was intimately familiar with the process and procedures for sterilizing and testing the lenses (Tr. III, p. 175). Further, he was intimately involved in maintaining and modifying the procedure for sterilizing the lenses and in the decision not to test the returned cloudy vials of lots 76285 and 76296 to determine whether there was bacteriological contamination.

Dr. Torigian told Copeland Intra Lenses that he had a doctorate in microbiology (Tr. I, p. 51) when, in fact, his doctorate was an honorary degree and his training was as a pharmacist (Tr. I, p. 75). But, even as a pharmacist he had the ability to understand and implement GMP's and the USP requirements applicable to the sterilization procedure. Moreover, on June 17, 1976, Dr. Torigian personally wrote to Copeland assuring him that the lenses were "handled by totally aseptic technology commensurate with CGMP (Current Good Manufacture Practice) established by FDA's most recent manual" (Exh. 3).[5] Thus, it is clear that Dr. Torigian personally was not only aware of the GMP's to which Mr. Mueller testified at length (Tr. III, pp. 112–136, 196–257), but he assured Copeland that they would be followed. Yet, even though Dr. Torigian made the guarantee, he did not exercise his ultimate responsibility as president and owner of the corporation to assure that proper procedures were being carried out, that batch records were properly endorsed, that rejects were tested and documented, that sterility testing records

---

5. Mr. Copeland characterized the substance of the June 17th letter as a "guarantee of sterility" (Tr. I, p. 55). Dr. Torigian testified, however, that Mr. Copeland "practically dictated" the letter and that it was a "promotional letter ... not a letter of guarantee." (Tr. V, p. 95). Mr. Copeland could not recall whether he had had any discussions with Dr. Torigian at the time of the letter (Tr. I, p. 55) though he stated that he probably responded to it verbally (Tr. I, pp. 172–173). Mr. Copeland denied ever having instructed Dr. Torigian as to the sterilization process to be used for Copeland lenses; however,

he added that he had made inquiries as to the nature of that process and that Dr. Torigian had supplied information which Copeland's scientific advisor believed showed an adequate process for sterilization (Tr. I, pp. 156–159, 177).

I do not think that the circumstances of the June 17th letter are particularly significant except as they relate to the issue of credibility. Dr. Torigian was under no obligation to write the letter and he knew what he was doing. In any event, on this point, the court credits Mr. Copeland's testimony.

comported with the company's own procedures and with the requirements of the USP.

As mentioned above, in August, 1976, Dr. Torigian personally decided upon the addition of the preservative potassium sorbate to the solution in the vials containing intraocular lenses. In November 1976, the master procedure for processing Copeland lenses was amended twice more (Exhs. 24 and 25; Tr. III, pp. 96, 105–107). Each of these changes was personally endorsed by Dr. Torigian (Tr. V, p. 79).

In addition, Dr. Torigian himself testified that he knew that the Copeland intraocular lenses processed by Torigian Laboratories were used for implantation in the eye and that it was absolutely necessary that they be sterile (Tr. V, p. 92). He further testified that he was aware that lots 76285 and 76296 had extraordinarily high number of rejects and that these same lots were sent back by Copeland to Torigian Laboratories for reprocessing (Tr. V, pp. 93–94). Yet, Dr. Torigian admitted he never inquired into the source of the problem and never directed that any bacteriological tests be run to determine whether there was contamination (Tr. V, p. 94). The lots were contaminated.

Dr. Torigian attempted at trial to distance himself from the actual processing of the lenses. He claimed that Mr. Dave had responsibility for actually supervising the procedure and that a microbiologist, a Ms. Lala, was the person who did the actual operation of washing, sterilizing, and packing the lenses. However, the court need not find that Dr. Torigian was the person who actually sterilized the lenses or even personally supervised the day to day operations in order to hold him criminally liable. In the *Park* case, involving adulterated foods at a particular warehouse, the president of the company was held liable even though he did not personally run the warehouse and, in fact, conducted business from an office in a different state. *Park*, 421 U.S. at 660 [95 S.Ct. at 1905].

Dr. Torigian was the president and owner of Torigian Laboratories. He had the responsibility and authority to implement measures to insure that contamination of lenses sterilized by the corporation did not occur. Although he personally endorsed changes in the procedures for sterilizing the lenses, he took no steps to detect and prevent the adulteration and misbranding, even when faced with clear warnings that his procedure had gone awry.

Based upon the evidence, I find that Dr. Torigian is personally liable for the adulteration and misbranding that occurred and is guilty on all 18 counts of the information. *Park*, 421 U.S. at 674 [95 S.Ct. at 1912]; see *United States v. New England Grocers Supply Co.*, *supra* at 232–34 (D.Mass. 1980).

## VERDICT

Based upon the foregoing discussion, it is the verdict of the court that the defendants, Torigian Laboratories, Inc. and Dr. Puzant C. Torigian, are guilty of all of the offenses charged in the information.

The decision as to whether defendants should be taxed with any part of the costs of the prosecution, under the authority granted to the court by 28 U.S.C. § 1918(b), will be discussed further at the time of sentencing.

Defendants shall report to the Probation Department forthwith for further proceedings preliminary to sentence.

SO ORDERED.

APPENDIX 1

CHART

| COUNT | COPELAND LENSE NUMBER | TORIGIAN LOT NUMBER[4] | SHIPPED TO | COLLECTED BY | ANALYZED BY | MICROORGANISM FOUND |
|---|---|---|---|---|---|---|
| 1, 4, 7, 13 | 19–1187620 | 76285 | Abbott Northwestern Hospital, Minneapolis, Minnesota (Exh. 11, 147; Tr. I, pp. 80–81) | Popham (Tr. II, pp. 4–6; Exh. 33) | Oxbarron (Tr. II, pp. 164–174) | pseudomonas aeruginosa; pseudomonas multipilia; pseudomonas putida (Tr. II, p. 177) |

C H A R T

| COUNT | COPELAND LENSE NUMBER | TORIGIAN LOT NUMBER[4] | SHIPPED TO | COLLECTED BY | ANALYZED BY | MICROORGANISM FOUND |
|---|---|---|---|---|---|---|
| 3, 6, 8, 14 | 19–1157623 | 76296 | Dr. Melto Goumas San Carlos California (Exh. 11, 13; Tr. I, pp. 81–82) | Longnecker (Tr. II, pp. 32–35; Exh. 34) | Oji (Tr. II pp. 225–232) Groomes, (Tr. III, pp. 5–7) | pseudomonas aeruginosa (Tr. III, pp. 5–7) |
| 1, 4, 9, 15 | 19–11876531 19–11876532 19–11876533 | 76285 | Perth Amboy General Hospital Perth Amboy, New Jersey (Exh. 11, 16; Tr. I, p. 75) | Mueller (Tr. I, p. 112; Tr. III, pp. 137–140; Exh. 31) | Palmieri (Tr. IV, pp. 6–16) | pseudomonas aeruginota; aceinetoba calcoceticus (Tr. IV, p. 16) |
| 1, 4, 10, 16 | 19–1187624 19–1187625 | 76285 | Dr. Jordan Burke, Sumitt, New Jersey (Exh. 11, 15; Tr. I, pp. 76–77) | Mueller (Tr. I, p. 112; Tr. III, pp. 137–140; Exh. 31) | Palmieri (Tr. IV, pp. 6–16) | pseudomonas aeruginosa, aceinetoba calcoceticus (Tr. IV, p. 16) |
| 1, 4, 11, 17 | 19–118764 19–118767 19–118768 19–118769 19–1187610 | 76285 | Palm Beach Eye Group, Palm Beach, Florida (Exh. 11, 17; Tr. I, pp. 77–79) | Mueller (Tr. I, p. 112; Tr. III, pp. 137–140; Exh. 31) | Palmieri (Tr. IV, pp. 6–16) | pseudomonas aesuginosa; aceintoba calcocenticm (Tr. IV, p. 16) |
| 2, 5, 12, 18 | 16–1022762 | 76289 | Abbott Northwestern Hospital Minneapolis, Minn. (Exh. 10, 12; Tr. I, pp. 69–70) | Popham (Tr. II, p. 8; Exh. 32) | Palmieri (Tr. IV, pp. 21–22) | pseudomonas alcaligines (Tr. IV, p. 23) |

---

APPENDIX 2

| | Collected by | Analyzed by | Microorganisms found |
|---|---|---|---|
| Counts 1, 4 lot 76285–19 | Mueller (Tr. III, pp. 137–140; Exh. 31) | Palmieri (Tr. IV, pp. 7–16) | Pseudomonas Aeruginosa — Pseudomonas Alcaligine — Aceinetoba Calcoceticis (Tr. IV, p. 16) |
| Counts 2, 5 lot 76289–16 | Popham (Tr. II, p. 8; Exh. 32) | Palmieri (Tr. IV, pp. 18–22) | Pseudomonas Alcaligine (Trv. IV, p. 23) |
| Counts 3, 6 lot 76296–19 | Longnecker (Tr. III, p. 31; Exh. 34) | Oji (Tr. II, pp. 225–230) | Pseudomonas Aeruginosa (Tr. III, p. 7) (Speciation by Groomes) |